# United States Court of Appeals
## For the First Circuit

No. 07-2409

GLADYS GARCÍA-RUBIERA; DOMINGO A. CORPORAN-SUÁREZ;
ADALBERTO RODRÍGUEZ; LOURDES MATOS; JOSÉ R. MALDONADO;
JOSÉ PÉREZ-CANABAL; MANUEL MOLINA-GODINEZ; DAVID CASTRO;
ADALBERTO AVILÉS; JORGE PLARD; LAURA PLARD-OCASIO;
GINOVA TORO-MORALES; NOEMÍ VALENTÍN-MARRERO,

Plaintiffs, Appellants,

v.

SILA MARÍA CALDERÓN, Governor of Puerto Rico, sued
in her personal capacity and in her official capacity as
Governor; JUAN ANTONIO FLORES-GALARZA, Secretary of the
Treasury Department of the Commonwealth of Puerto Rico,
sued in his personal capacity and in his official capacity,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO
[Hon. Gustavo A. Gelpí, U.S. District Judge]

Before
Torruella, Howard, Circuit Judges,
and DiClerico,[*] District Judge.

Antonio J. Amadeo-Murga, for appellants.
Irene S. Soroeta-Kodesh, Assistant Solicitor General, with
whom Salvador J. Antonetti-Stutts, Solicitor General, were on brief
for appellees.

June 30, 2009

---

[*] Of the District of New Hampshire, sitting by designation.

**TORRUELLA**, <u>Circuit Judge</u>.  This difficult appeal concerns constitutional challenges to amendments to Puerto Rico's Compulsory Motor Vehicle Liability Insurance Act, Act No. 253 ("Law 253").

Law 253 requires Puerto Rican motor vehicle owners to pay an annual premium for compulsory car insurance at the time of acquisition or renewal of vehicle registration.  The premiums, initially collected by the Secretary of the Treasury (the "Secretary"), are transferred to the Compulsory Liability Joint Underwriting Association of Puerto Rico ("JUA"), a Commonwealth-created association of all private insurers in Puerto Rico.  JUA then provides the compulsory car insurance.

Motor vehicle owners can opt out of the compulsory liability insurance scheme by privately purchasing insurance with the same or comparable coverage.  Those owners who opt out can either avoid paying the uniform premium at vehicle registration or seek reimbursement of the "duplicate premium" paid.

The amendments at issue in this appeal, Law 230 and Law 414, concern the duplicate premiums collected by JUA.  In essence, the amendments mandate the transfer of funds designated by JUA for the reimbursement of duplicate premiums (plus the interest they generate) <u>back to</u> the Secretary for use by the Commonwealth to address budget shortfalls.  Moreover, Law 230 promulgates a separate procedure, Procedure No. 96, to provide reimbursement.

In 2002, the plaintiffs-appellants (the "Plaintiffs"), all owners of motor vehicles in Puerto Rico who privately purchased car insurance but paid duplicate premiums, filed suit against the Secretary and the Governor of the Commonwealth (the "Governor" and, together with the Secretary, the "Defendants") in their official and personal capacities.[1] Plaintiffs claim that Law 230 and Law 414 violate the Takings, Due Process, and Equal Protection Clauses. They sought declaratory relief, preliminary and permanent injunctive relief, reimbursement, compensatory damages, and certification of a class of similarly situated vehicle owners. The district court denied almost all relief requested, including Plaintiffs' request for class certification. However, the district court granted a preliminary injunction, later made permanent, enjoining the transfer of the interest generated by the duplicate premiums and ordering the Commonwealth to develop an adequate scheme of reimbursement of that interest. This appeal followed. After careful consideration, we affirm-in-part, reverse-in-part, and remand for further proceedings.

## I. Background

Our discussion of Law 253 and the amendments at issue in this appeal draw from, and incorporate by reference, our prior

---

[1] At the time of the filing of this action, Juan Antonio Flores-Galarza was Secretary and Sila María Calderón was Governor, although they no longer hold those positions. Because they were sued in their personal capacities, they remain parties to this action.

decisions concerning Law 253. See Asociación de Subscripción Conjunta del Seguro de Responsibilidad Obligatorio v. Flores Galarza, 484 F.3d 1 (1st Cir. 2007); Arroyo-Melecio v. Puerto Rican Am. Ins. Co., 398 F.3d 56 (1st Cir. 2005).

**A. Law 253**

Law 253, codified at P.R. Laws Ann. tit. 26, §§ 8051-61, requires liability insurance coverage for all registered motor vehicles in Puerto Rico "that travel on public thoroughfares." Flores Galarza, 484 F.3d at 6. To that end, Law 253 provides for compulsory liability insurance, "'with $3000 of coverage for damages caused to third parties per accident in exchange for a uniform premium, initially set at $99 for each private passenger vehicle and $148 for each commercial vehicle.'" Id. (quoting Arroyo-Melecio, 398 F.3d at 60-61). The compulsory liability insurance is provided by JUA, "an association of all private insurers in Puerto Rico." Id. at 7. JUA must provide this coverage to all drivers, even high risk ones, with "'the risk of insuring these high-risk drivers . . . spread among all of the private insurers.'" Id. (quoting Arroyo-Melecio, 398 F.3d at 62).

To fund the compulsory liability insurance, Law 253 requires motor vehicle owners to pay the uniform premium annually to the Secretary at the time of acquisition or renewal of vehicle registration. Id. (citing Arroyo-Melecio, 398 F.3d at 61 n.2).

-4-

The Secretary then transfers the premiums periodically to JUA.  Id.
(citing P.R. Laws Ann. tit. 26, § 8055(c)).

Motor vehicle owners can "opt out of the compulsory liability insurance scheme by privately purchasing liability insurance with comparable or better coverage."  See id. at 7 (citing Arroyo-Melecio, 398 F.3d at 61 n.2).  Although, in some circumstances, individual motor vehicle owners who opt out can "avoid paying the compulsory insurance premium to the Secretary" at the time of registration, see id. at 7 n.2, a number of such vehicle owners still pay the compulsory insurance premium.[2]  For those owners, Law 253 provides for reimbursement; in particular, vehicle owners "may then seek reimbursement directly from the JUA or from his insurer, who will, in turn, seek reimbursement from the JUA."  Id. at 7.  These procedures are not at issue in this appeal.

---

[2]  Specifically, individuals who have "the requisite amount of traditional liability insurance" can "avoid paying the compulsory insurance premium to the Secretary" by presenting a "Certificate of Compliance" from their insurer.  Id. at 7 n.2.

As noted in Flores Galarza, it is unclear whether all individuals who opt out by privately purchasing insurance can avoid paying the compulsory insurance premium at vehicle registration. That is because Puerto Rico law defines "[t]raditional liability insurance" as "insurance protecting against both personal and property damage 'resulting from or incident to ownership, maintenance, or use of any . . . vehicle."  Id. (citing Law 253 and P.R. Laws Ann. tit. 26, § 407(1)).  Accordingly, those who buy less than "traditional liability insurance," but insurance sufficient to opt out of the compulsory insurance scheme, do not appear to be able to avoid paying the compulsory insurance premium at registration.  We so concluded in Flores Galarza, see id. at 7 n.3, although we do not need to address the issue here.

"Because a portion of the total amount of premiums received by JUA may be owed to third parties who seek refunds for duplicate payments," JUA is required by law to "set aside these premiums and accumulate them in a separate reserve account (the "Reserve")." Id. at 8. However, since January 1, 1998, the effective date of Law 253, JUA "has been unable to determine exactly how many registered motor vehicles in Puerto Rico are covered by private liability insurance." Id. As a result, JUA has divided the Reserve account between the "duplicate premiums" it estimates it is required to reimburse to motor vehicle owners, and an "overstated" amount of funds, which are funds set aside by JUA as a buffer to meet all requests for reimbursement. See id. at 8-9.[3]

The general provisions of Puerto Rico insurance law with respect to "unclaimed funds" apply to Law 253. See id. at 8 n.5 ("Puerto Rico's Insurance Code makes clear that this general provision applies to the compulsory liability insurance system under Law 253." (citing P.R. Laws Ann. tit. 26, § 2612)). Under Puerto Rico insurance law, vehicle owners have seven years to claim a duplicate premium. See P.R. Laws Ann. tit. 26, § 2603; see also

_____

[3]   In Flores Galarza JUA represented that from 1998 to 2001 it estimated that 25% "of all vehicles were covered by policies from private insurers, and, accordingly, set aside 25% of all premiums received" in the Reserve. See id. at 8. For fiscal year 2001, it reduced the amount reserved to approximately 17%. Id. at 8-9. But see id. at 11 n.13 (noting discrepancy in percentages withheld).

-6-

Flores Galarza, 484 F.3d at 10 n.9.  Otherwise, the duplicate premium escheats to the Commonwealth.

### B.  Law 230 and Law 414

On September 11, 2002, the Puerto Rican legislature enacted Law 230, codified at P.R. Laws Ann. tit. 26, § 8055(l). Law 230 requires JUA to retransfer to the Secretary all funds held in the Reserve every two years to balance the Commonwealth's budget.  The first transfer mandated under Law 230, $73 million, occurred the same month of Law 230's enactment.[4]  Law 230 also provided that the Commonwealth could spend $53 million of the funds immediately.  The $53 million, according to the Statement of Motives of the subsequently enacted Law 414, corresponded to the overstated funds contained in the Reserve.[5]

Under Law 230, the remaining $20 million, an estimate of the actual duplicate premiums paid, remained in the custody of the Secretary as trustee for five years, after which all unclaimed

---

[4]  In fact, the $73 million was never transferred to JUA in the first place.  As discussed in more detail in Flores Galarza, beginning in 2002, the Secretary refused to transfer the premiums it collected to JUA, a practice that ended when the parties reached a settlement in November 2002.  484 F.3d at 9-10.  Pursuant to the settlement, the Secretary transferred to JUA all but $73 million, which was the amount Law 230 required JUA to retransfer back to the Secretary.  See generally id. at 9-10.

[5]  This conflicts with Flores Galarza, where the overstated amount was estimated to be between $8 million and $10 million.  See id. at 8, 11 n.13.  The parties provide no explanation for this discrepancy, although Plaintiffs contend that the $8 million to $10 million amount is the correct one.

-7-

duplicate premiums became the property of the Commonwealth. However, any income generated by the funds, such as interest, reverted to the Commonwealth's General Fund as it accrued.

Accordingly, under Law 230, "the seven-year period provided by the general provisions of Puerto Rico's Insurance Code . . . [is divided] among the JUA (which holds the funds for two years) and the Secretary (who holds the funds for five additional years), after which time the funds lapse to the general fund." Flores Galarza, 484 F.3d at 10 n.9.

Pursuant to Law 230, the Secretary adopted Procedure No. 96, a procedure by which motor vehicle owners can seek reimbursement from the Secretary. To obtain reimbursement, a vehicle owner must fill out a model form and submit, via mail or at certain designated offices, the following:

> a. Copy of the Motor Vehicle Registration License for which such reimbursement is being claimed;
>
> b. Copy of the insurance policy. Said policy shall be for each year that is being claimed;
>
> c. In the case such that it is the insurance firm which is making the claim, it shall attach certified copies of those policies that it is claiming;
>
> d. Certification of payment of the policy for each year being claimed. Such certification shall be issued by the insurance firm;
>
> e. Certification that such insurance firm has not received any reimbursement from [JUA], nor has reimbursed the premium for the Mandatory Liability Insurance, to the insured party.

-8-

According to the Statement of Motives of Law 414, the Secretary has only reimbursed approximately $500,000 of duplicate premiums in the first two years of the enactment of Law 230.

On September 22, 2004, the legislature passed Law 414, also codified at P.R. Laws Ann. tit. 26, §§ 8055(1). Among other things, Law 414 permitted the Commonwealth to use $19 million of the remaining funds transferred in September 2002 to balance the 2004-05 fiscal year budget. Law 414 also requires the Commonwealth to use money from the General Fund and the Budgetary Fund to reimburse vehicle owners if the amount transferred by JUA every two years is not sufficient to satisfy reimbursement requests.

## C. Procedural History

Plaintiffs are motor vehicle owners who privately purchased liability insurance but also paid duplicate premiums. On February 6, 2002, in anticipation of the passage of Law 230, Plaintiffs filed a complaint in district court seeking equitable relief and damages under 42 U.S.C. § 1983. Plaintiffs refuse to seek reimbursement from the Secretary through Procedure No. 96.[6]

_____

[6] In 2001, Plaintiffs filed a class action in the Commonwealth Court of First Instance seeking reimbursement from JUA. The action was dismissed for lack of primary jurisdiction, and on June 11, 2008, the Puerto Rico Court of Appeals upheld the dismissal. See García-Rubiera v. Asociación de Subscripción Conjunta del Seguro de Responsibilidad Obligatorio, No. KLAN200700327 (P.R. Cir. Jun. 11, 2008) (translation provided by the parties). In its decision the Court of Appeals held that Law 230 placed exclusive primary jurisdiction for any claims for reimbursement with the Secretary. Thus, Plaintiffs' failure to utilize Procedure No. 96 deprived the Court of First Instance jurisdiction to address their claims. See

In their complaint, which has been amended,[7] Plaintiffs assert a property interest in the duplicate premiums and the interest they generate. Consequently, Plaintiffs contend that each transfer of the funds from the Reserve account to the Secretary, starting with the $73 million in September of 2002, constitutes a temporary physical appropriation of their property without compensation and without due process, in violation of the Fifth and Fourteenth Amendments. They also contend that the Secretary permanently, and unlawfully, appropriated the interest generated by the funds. Finally, they contend that, as payers of the duplicate premiums, they and others similarly situated were singled out by the Commonwealth to address its budget concerns, in violation of the Equal Protection Clause.

Plaintiffs sought

1.   a declaratory judgment that the Governor "cannot implement" Laws 230 and 414;

2.   a preliminary and permanent injunction to prevent the transfer of funds from the Reserve to the Secretary;

---

id. slip. op. at 16-19. The Court of Appeals did not address the merits of Plaintiffs' constitutional claims. Id. slip op. at 21.

[7] Plaintiffs amended the complaint on December 24, 2004 after the district court dismissed the original complaint without prejudice on February 9, 2004. The district court dismissed the complaint on standing and ripeness grounds. In essence, the district court found that Plaintiffs' claims were premature because "it was uncertain" that Law 230, then known as Bill 2114, would pass "and the Commonwealth will in fact appropriate the funds for the 2002-2003 budget."

3.    $70 million in damages from the Secretary and the Governor in their personal capacities; and

4.    costs and attorneys' fees.[8]

Plaintiffs also sought to certify a class. The Governor and the Secretary each moved to dismiss the claims, claiming, among other things, qualified immunity. Plaintiffs opposed, and moved separately for a preliminary injunction and class certification.

On August 30, 2007, the district court issued an opinion and order that addressed these various motions. García-Rubiera v. Flores-Galarza, 516 F. Supp. 2d 180 (D.P.R. 2007). In the order, the district court dismissed as unripe the takings claim with respect to the duplicate premiums, since Plaintiffs had not availed themselves of their administrative remedy under Procedure No. 96. Id. at 188-90. The order also dismissed Plaintiffs' damages claims against the Secretary and the Treasurer in their personal capacities, finding that both were entitled to qualified immunity. Id. at 194-95. The district court further denied preliminary injunctive relief that would have prevented the Commonwealth from taking title to those duplicate premiums transferred in September 2002, which were scheduled to escheat to the Commonwealth in September 2007. Id. at 195-96. The district court also denied Plaintiffs' motion for class certification. Id. at 198. However,

---

[8]    Plaintiffs also seek reimbursement, but any claim for reimbursement against Defendants in their official capacities, to the extent that it is a claim for damages, is barred by the Eleventh Amendment. See Flores Galarza, 484 F.3d at 23-25 & n.27.

the district court granted a preliminary injunction, made permanent, that enjoined Defendants from depositing into the General Fund any interest generated by the duplicate premiums. Id. at 196-98 & n.20.

The district court later entered a separate judgment setting forth the terms of the permanent injunction, whereby it retained jurisdiction until the Commonwealth instituted a constitutionally adequate scheme "to deal with the interest generated by the Duplicate Premiums." It further stated that "[j]udgment is also entered dismissing all claims against [the Secretary] and [the Governor] in their personal capacities." Plaintiffs now appeal.

## II.  Discussion

Plaintiffs raise several issues on appeal. We discuss each in turn.

### A.  The Takings Claim

Plaintiffs first argue that the district court erred by dismissing their Takings Clause claim with respect to the duplicate premiums as unripe because of Plaintiffs' refusal to pursue their administrative remedy under Procedure No. 96. As discussed in more detail below, we disagree with the district court and conclude that Plaintiffs' takings claim for declaratory and injunctive relief is ripe despite their failure to utilize Procedure No. 96.

-12-

We review de novo the dismissal of a takings claim on ripeness grounds. Deniz v. Municipality of Guaynabo, 285 F.3d 142, 145 (1st Cir. 2002). To assert a ripe takings claim, a plaintiff must satisfy "'two independent procedural hurdles.'" Flores Galarza, 484 F.3d at 13 (quoting Suitum v. Tahoe Reg'l Planning Agency, 520 U.S. 725, 733-34 (1997)). As explained by the Supreme Court in Williamson County Reg'l Planning Commission v. Hamilton Bank, 473 U.S. 172 (1985), a plaintiff asserting a takings claim must demonstrate that (1) he or she "received a final decision from the state on the use of his property," and (2) "sought compensation through the procedures the State has provided for doing so." See Flores Galarza, 484 F.3d at 13-14 (quoting Williamson County, 473 U.S. at 194). Plaintiffs have the burden of demonstrating ripeness. See Pascoag Reservoir & Dam, LLC v. Rhode Island, 337 F.3d 87, 91 (1st Cir. 2003) (holding that "[a] federal suit is not timely until a plaintiff demonstrates" ripeness (emphasis added)).

## 1. The Finality Prong

Plaintiffs satisfy the first, finality prong. First, Plaintiffs have a sufficient property interest in the duplicate premiums to support their takings claim. For purposes of the Takings Clause, "the existence of a property interest is determined by reference to 'existing rules or understandings that stem from an independent source such as state law.'" See Phillips v. Wash. Legal Found., 524 U.S. 156, 164 (1998) (quoting Bd. of Regents of

-13-

State Colls. v. Roth, 408 U.S. 564, 577 (1972)). Here, Puerto Rico law plainly establishes that Plaintiffs have a sufficient property interest in the duplicate premiums. By regulation, JUA must segregate those premiums collected that are thought to be duplicate premiums, and Puerto Rico's insurance law concerning "unclaimed funds" apply to the duplicate premiums collected. See Flores Galarza, 484 F.3d at 8 & n.5. Furthermore, upon transfer to the Secretary, Law 230 requires the Secretary to hold the duplicate premiums in a fiduciary capacity. See P.R. Laws Ann. tit. 26, §§ 8055(1) ("The Secretary of the Treasury shall retain these funds as trustee . . . .") (emphasis added). Finally, Law 253, Law 230, and Law 414 all provide for reimbursement of the duplicate premiums. Thus, like funds held in trust in an IOLTA account or an interpleader account, the funds held by JUA or the Secretary are clearly the "private property" of Plaintiffs for purposes of the Takings Clause. See Phillips, 524 U.S. at 164 ("All agree that under Texas law the principal held in IOLTA trust accounts is the 'private property' of the client."); see also Webb's Fabulous Pharmacies, Inc. v. Beckwith, 449 U.S. 155, 161 (1980) (holding that funds deposited in interpleader fund for benefit of creditors are the property of creditors); cf. Flores Galarza, 484 F.3d at 30 (finding that the duplicate premiums "'constitute a double payment for the same insurance,' and, therefore, do not belong to JUA, but

-14-

rather belong to private insured motorists.") (quotations omitted and emphasis added).[9]

Second, the Secretary's appropriation of the duplicate premiums constitutes a "final decision" for purposes of the finality prong. "[T]he finality requirement is concerned with whether the initial decisionmaker has arrived at a definitive position on the issue that inflicts an actual, concrete injury." Id. at 15 n.18 (quoting Williamson County, 473 U.S. at 193) (emphasis added). As we stated in Flores Galarza,

> The case law addressing the first "hurdle" focuses on whether the administrative body responsible for applying the challenged regulations has completed discretionary review of the plaintiff's particular situation. Here, there is no pending administrative process that could, through a variance, waiver or other discretionary decision, modify the statute's impact on the JUA.

Id. at 15. The same is true here, as there is no pending process that would "modify the statute's impact" on Plaintiffs.

## 2. The Just Compensation Prong

Consequently, at issue is whether Plaintiffs have satisfied the second, "just compensation" prong. The just

---

[9] We further note that Defendants do not appeal the injunction entered by the district court with respect to the interest generated by the duplicate premiums. Since the basis of Plaintiffs' property interest in the interest is based on the maxim that "'interest follows principal,'" see Flores Galarza, 484 F.3d at 32 (quoting Phillips, 524 U.S. at 165-72), it would be anomalous if Plaintiffs have a property interest in the interest generated by the duplicate premiums but not the premiums themselves.

compensation prong presents some difficulty for Plaintiffs, since Procedure No. 96 provides a procedure to reimburse the duplicate premiums, and Plaintiffs refuse to avail themselves of it. By their own admission, Plaintiffs have not "sought compensation through the procedures the State has provided for doing so." Id. at 14 (citations omitted); see also Williamson County, 473 U.S. at 197 (holding that the takings claim in that case was unripe "until [the plaintiff] has utilized th[e] procedure" for just compensation provided by the state). For that reason, the district court dismissed Plaintiffs' claim as unripe. See García-Rubiera, 516 F. Supp. 2d at 190.

However, we have recognized exceptions to the just compensation prong. We have noted that facial challenges to a regulation "are generally ripe the moment the challenged regulation or ordinance is passed." Flores Galarza, 484 F.3d at 14 (quoting Suitum, 520 U.S. at 736 n.10). Moreover, we have held that a plaintiff is relieved of the second prong if the procedure is "unavailable," "inadequate," or "futile." See id. (noting that second prong does not apply when a procedure is "unavailable or inadequate" (quoting Williamson County, 473 U.S. at 197)); see also Pascoag, 337 F.3d at 92-93 (noting that futility is an exception to this prong). Finally, we noted in Flores Galarza that the just compensation prong may not apply in certain circumstances to a

-16-

"taking that involves the direct appropriation of funds." See 484
F.3d at 19.

On appeal, Plaintiffs argue that all three categories of
exceptions apply.[10] We agree as to the third category, and conclude
that Plaintiffs' claim for declaratory and injunctive relief is
ripe because their claim "involves the direct appropriation of
funds."

In Flores Galarza, we noted that the Supreme Court
expressed doubt that a federal takings claim seeking declaratory
and injunctive relief would require individuals to first seek
compensation under the Tucker Act, which is "usually . . . a
preliminary step in a takings action against the federal
government." Id. (citing the plurality opinion in Eastern Enters.
v. Apfel, 524 U.S. 498 (1998)). Apfel concerned a challenge to the
Coal Act, "which established a mechanism for funding health care
benefits for coal industry retirees," and which required private
coal operators "to contribute to the payment of premiums to fund
such benefits." Id. (citing Apfel, 524 U.S. at 504). Eastern, one
such private coal operator, brought both facial and as-applied

---

[10] It is unclear whether Plaintiffs limit their takings challenge
to solely a facial challenge. Plaintiffs' takings claim is not
well-presented, and at times in their brief suggest such a
limitation while, at the same time, they state that they are
entitled to "go to trial and present evidence that the procedure's
net effect would have been to deprive the substantial majority of
the owners of their reimbursement." Given this lack of clarity, we
construe Plaintiffs' argument as presenting both facial and as-
applied takings challenges.

takings challenges, and sought a declaratory judgment and an injunction against enforcement of the act by the Commissioner of Social Security.  Apfel, 524 U.S. at 520.  Eastern did not seek compensation.  Id.

A plurality concluded that the availability of Tucker Act compensation did not prevent Eastern from asserting its takings claim.  It did so because to require Eastern to assert its claim would result in an "utterly pointless set of exercises," since "Congress could not have contemplated that the Treasury would compensate coal operators for their liability under the Act, for '[e]very dollar paid pursuant to a statute would be presumed to generate a dollar of Tucker Act compensation.'"  Id. at 521 (quoting In re Chateaugay Corp., 53 F.3d 478, 493 (2d Cir. 1995)).  Instead, "the Declaratory Judgment Act allows individuals threatened with a taking to seek a declaration of the constitutionality of the disputed governmental action before potentially uncompensable damages are sustained."  Id. (quotation marks omitted).

In Flores Galarza, we analogized the takings claim raised by JUA to the claim raised in Apfel.  Although we recognized differences between the two contexts, we stated that "the nature of [JUA's] claim -- that Puerto Rico's Secretary of the Treasury improperly withheld money belonging to the JUA so that it may be used for public purposes -- strikes us as equivalent to the

complaints against the 'direct transfer of funds' at issue in Apfel and the decisions its cites." See Flores Galarza, 484 F.3d at 20.

Here, even before the passage of Law 230, Plaintiffs have sought to enjoin the transfer of the duplicate premiums to the Secretary and a declaratory judgment that such a transfer was unlawful. In other words, Plaintiffs have consistently sought "a declaration of the constitutionality of the disputed governmental action before potentially uncompensable damages are sustained." Apfel, 524 U.S. at 521. Thus, to require Plaintiffs to seek compensation for property taken when it has continually sought to enjoin such takings in the first place "would entail an utterly pointless set of activities." Flores Galarza, 484 F.3d at 20 (citations and quotation marks omitted). Since Plaintiffs' takings claim for declaratory and injunctive relief mirrors the claims in Flores Galarza and Apfel in this crucial respect, we hold that they are ripe.

For the above reasons, we reverse the district court and hold that Plaintiffs' takings claim is ripe with respect to their requests for declaratory and injunctive relief.

**B.  The Due Process Claim**

Plaintiffs also contend that Law 230 violates the Due Process Clause because it is a "spurious escheat statute" that transfers the duplicate premiums to the Commonwealth without providing notice of the transfers. Specifically, Plaintiffs

-19-

challenge the transfer of the Reserve account from JUA every two years to balance the budget, which they contend effects an "escheat" of the premiums to the Commonwealth in violation of Puerto Rico law, which requires seven years of abandonment before the Commonwealth can take over the funds. See P.R. Laws Ann. tit. 26, § 2603; id. § 2612 ("The [general provision governing unclaimed funds] shall prevail over the provisions of any other chapter present or future which may be in conflict herewith."). Plaintiffs argue that because Law 230 "did not provide any notice to the persons who might have an interest in" the transferred duplicate premiums, it violates their due process rights.[11]

As discussed in more detail below, although we agree with Plaintiffs that they have a sufficient property interest in the duplicate premiums for purposes of due process, we remand for further proceedings to determine whether the transfers to the

_____

[11] We note that Plaintiffs' due process claim only goes to the lack of notice of the transfer of the duplicate premiums to the Secretary pursuant to Law 230. Plaintiffs do not challenge the sufficiency of the notice post-transfer but prior to escheat.

We further note that Puerto Rico's insurance code requires "[e]very insurer and every general agent, manager, or producer" to produce a report of all unclaimed premiums, see P.R. Laws Ann. tit. 26, § 2604(1), and "cause notices to be published based on the information contained in the reports." Id. § 2605(1). Moreover, "[s]uch notice must be published once a week for two (2) consecutive weeks in a newspaper of general circulation in Puerto Rico." Id. Presumably, "general agent, manager, or producer" includes the Secretary, but we do not need to address the matter here. See id. § 2612 ("The provisions of this chapter shall prevail over the provisions of any other chapter present or future which may be in conflict herewith.").

-20-

Secretary constitutes a sufficient deprivation of that property interest to require notice under the Due Process Clause.

## 1. **Relevant Procedural Background**

The district court did not directly address this specific due process challenge with respect to Plaintiffs' claim for equitable relief.[12] As background, the district court denied Plaintiffs' motion for preliminary injunctive relief based on their due process claims because Plaintiffs failed to assert a likelihood of success on the merits. García-Rubiera, 516 F. Supp. 2d at 196. The district court found that Plaintiffs "have not shown that available remedies under the Commonwealth law are inadequate to redress any deprivation resulting from the transfer of the Duplicate Premiums to the Secretary;" specifically, Plaintiffs failed to "make [an] evidentiary proffer to support their allegations that Procedure No. 96 is onerous and 'difficult if not impossible.'" Id. (citing Rumford Pharmacy, Inc. v. E. Providence, 970 F.2d 996, 999 (1st Cir. 1992)). The district court further noted that since "Plaintiffs appear to have an adequate remedy at law which they have elected not to pursue," they "will not . . . suffer irreparable injury if denied equitable relief." Id. The district court proceeded to enter a preliminary injunction, which it later made permanent, only as to Plaintiffs' claims with respect

---

[12] The district court dismissed Plaintiffs' due process claims for compensatory damages on qualified immunity grounds, and we address the dismissal of those claims separately below.

-21-

to the interest earned by the duplicate premiums.  Id. at 197. Left unaddressed was Plaintiffs' due process claim with respect to notice.  The district court instead focused on Plaintiffs' claim that Procedure No. 96 was "onerous."[13]  Id. at 196.

In fact, although the district court denied preliminary injunctive relief with respect to the duplicate premiums, the court never explicitly disposed of Plaintiffs' due process claim.  After denying preliminary injunctive relief, the district court proceeded to enter a final judgment setting forth the terms of the permanent injunction as to the interest generated by the duplicate premiums, and further stated that "[j]udgment is also entered dismissing all claims against [Defendants] in their personal capacities."

## 2.  Analysis

Since Plaintiffs challenge the district court's denial of preliminary injunctive relief, "'we scrutinize abstract legal matters de novo, findings of fact for clear error, and judgment calls with considerable deference to the trier.'"  See Waterproofing Sys., Inc. v. Hydro-Stop, Inc., 440 F.3d 24, 28 (1st Cir. 2006) (quoting Re-Ace, Inc. v. Wheeled Coach Indus., Inc., 363 F.3d 51, 55 (1st Cir. 2004)).  Moreover, based on the above, we construe the district court's actions as denying Plaintiffs' due

---

[13]  We speculate that one reason why the district court did not address this particular due process claim may be because Plaintiffs did not adequately present the claim below.  However, Defendants do not assert waiver as a defense, and as both parties briefed the issue, we address it.

-22-

process claim for equitable relief. Thus, we review the denial of declaratory relief "for something akin to abuse of discretion." See Rossi v. Gemma, 489 F.3d 26, 38 & n.21 (1st Cir. 2007). Similarly, we review the denial of a permanent injunction for abuse of discretion, with any legal conclusions reviewed de novo and any factual findings reviewed for clear error. See Aponte v. Calderón, 284 F.3d 184, 191 (1st Cir. 2002) ("Generally, we review a grant of a permanent injunction for abuse of discretion, but we always review questions of law de novo [and] factual findings for clear error." (citations omitted)).

To the extent that Plaintiffs are entitled to notice, they clearly lack it here. Due process requires "'notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" Jones v. Flowers, 547 U.S. 220, 226 (2006) (quoting Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950)); see also Taylor v. Westly, 488 F.3d 1197, 1201 (9th Cir. 2007) (same). In other words, "when notice is a person's due . . . [t]he means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it." Jones, 547 U.S. at 229 (quoting Mullane, 339 U.S. at 315).

Here, Plaintiffs do not challenge the adequacy of the notice provided by Law 230. Plaintiffs instead claim that, on its

face, Law 230 provides no notice of the transfer of the duplicate premiums from JUA to the Secretary every two years. Based upon our own review of Law 230 and Procedure No. 96, we agree. Law 230 makes no mention of notice. Instead, Law 230 only directs that the funds in the Reserve account be transferred to the Secretary. Procedure No. 96 also fails to provide notice. It provides that a reimbursement claim can be made "through the Public Insurance Area through Form SC-4601, Request for Reimbursement of Mandatory Insurance," and that "[s]ame shall be available in the Internet or at Collector's Offices." Procedure No. 96 also sets forth the proof necessary to file a successful reimbursement claim. Despite all of these provisions, no mention of notice is made. The closest Procedure No. 96 comes to indicating notice is a direction that, upon transfer, JUA "shall forward an electronic file . . . which shall contain the information which is indicated in Attachment 1, bearing those insureds that are entitled to such reimbursement." Procedure No. 96, however, does not further direct that those named insureds receive notice of the transfer.

In response, Defendants argue, without citing any supporting authority, that Plaintiffs had "plenty of notice" because they filed this action prior to the enactment of Law 230. However, Plaintiffs' actual notice has no bearing in this case because Plaintiffs assert a facial challenge to Law 230. Plaintiffs argue that Law 230 is unconstitutional on its face

because it fails to include a process whereby motor vehicle owners who paid duplicate premiums are provided notice that their premiums are going to be transferred to, and held by, the Secretary. Defendants do not dispute the absence of such a provision. Thus, actual notice cannot defeat Plaintiffs' due process claim.

Defendants also argue, again without citing supporting authority, that the mere passage and publication of Law 230 provided notice of the transfers of the duplicate premiums and the mechanism by which the payers of duplicate premiums could seek reimbursement. However, Plaintiffs' argument is not that due process required them to receive notice of the available procedure for obtaining reimbursement. See City of West Covina v. Perkins, 525 U.S. 234, 241 (1999) ("Once the property owner is informed that his property has been seized, he can turn to [the state statute or case law] to learn about the remedial procedures available to him."). Rather, their claim is that they are entitled to notice that the Commonwealth is about to assert a contrary property interest in their duplicate premiums. In such circumstances, mere publication of the law effectuating a seizure of a property interest does not constitute constitutionally adequate notice. See Mullane, 339 U.S. at 314 ("Th[e] right to be heard has little reality or worth unless one is informed that the matter [affecting one's property rights] is pending and can choose for himself

-25-

whether to appear or default, acquiesce or contest"); see also Covina, 525 U.S. at 240 (same, quoting Mullane).

But Plaintiffs must first establish at least two threshold requirements before it is entitled to notice under the Due Process Clause. First, "[a] threshold requirement for a successful procedural due process claim is to demonstrate the implication of a constitutionally protected interest in life, liberty, or property." Aponte, 284 F.3d at 191 (citing Romero-Barceló v. Hernández-Agosto, 75 F.3d 23, 32 (1st Cir. 1996)). Plaintiffs have demonstrated such an interest. In general, we perform the same analysis in determining whether a property interest is sufficient under both the Takings Clause and the Due Process Clause. See Picard v. Members of Employee Ret. Bd. of Providence, 275 F.3d 139, 144 (1st Cir. 2001) (noting that "[i]n evaluating whether a purported contract or property right is entitled to constitutional protection under the Takings Clause, Contract Clause, or Due Process Clause, this Court generally looks to state law as interpreted by the state's highest court" (citing cases)); cf. Nat'l Educ. Ass'n-R.I. v. Ret. Bd. of the R.I. Employees' Ret. Sys., 172 F.3d 22, 30 (1st Cir. 1999) ("An expectation that is not 'property' for purposes of the Takings Clause may yet sometimes entitle the citizen to procedural protection . . . before the expectation is cut off by government action."). Since we hold that Plaintiffs have a sufficient

-26-

interest in the duplicate premiums for Takings Clause purposes, we also hold that Plaintiffs have a sufficient interest in the duplicate premiums for Due Process Clause purposes.

Once a property interest is established, Plaintiffs must then show that "the defendants, acting under color of state law, deprived [them] of that property interest without constitutionally adequate process." See SFW Arecibo, Ltd. v. Rodríguez, 415 F.3d 135, 139 (1st Cir. 2005) (quoting PFZ Props., Inc. v. Rodríguez, 928 F.2d 28, 30 (1st Cir. 1991)) (emphasis added). In this case, the alleged deprivation caused by Law 230 -- the transfer of the duplicate premiums to the Secretary -- does not cause a permanent escheat. Instead, the funds are to be held in trust by the Secretary until the escheat period set forth under Puerto Rico insurance law passes.

The Supreme Court has held that "even the temporary or partial impairments to property rights that attachments, liens, and similar encumbrances entail are sufficient to merit due process protection." See Connecticut v. Doehr, 501 U.S. 1, 12 (1991). In Doehr, for example, a Connecticut statute permitted plaintiffs in civil suits to obtain ex parte attachments against defendants with a showing so minimal -- an averment by the plaintiff that the defendant is liable -- that it resulted in a "significant risk of erroneous deprivation." Id. at 21. Following Doehr, in Reardon v. United States, 947 F.2d 1509 (1st Cir. 1991) (en banc), we held

-27-

that filing a CERCLA lien without notice or a pre-deprivation proceeding constituted a sufficient deprivation of property since "[t]he EPA's lien has substantially the same effect . . . as the attachment had on the [property owner] in Doehr -- clouding title, limiting alienability, [and] affecting current and potential mortgages." Id. at 1518.

The alleged deprivation caused by Law 230 has some similarities to the "temporary or partial" deprivations in Doehr and Reardon. Like a lien or attachment, the alleged deprivation in this case is "temporary or partial," because Law 230 allows payers of the duplicate premiums to receive reimbursement. The deprivation here, like in Doehr and Reardon, only results in a "risk of erroneous deprivation." Doehr, 501 U.S. at 21. Moreover, like a lien or attachment, the Secretary, through operation of Puerto Rico's general escheat statute, has a contingent interest in the duplicate premiums, one that poses a risk of complete deprivation should Plaintiffs fail to obtain reimbursement during the escheat period.

But the alleged deprivation in this case differs from the deprivations in Doehr and Reardon in two important respects. First, unlike in Doehr or Reardon, Plaintiffs do not have use of the duplicate premiums prior to the transfer, as they are already held in trust by JUA. The transfers only result in a change of trustees. Second, the laws at issue in Doehr and Reardon created

-28-

the liens or attachments at issue without adequate due process. In this case, however, the Secretary already has a contingent interest prior to the transfer, insofar as the escheat period had already begun to run prior to the transfer. The only change effected by the transfer, apart from the change in trustee, is the change in procedure to obtain reimbursement. In sum, the alleged deprivation here is not the creation of a lien or attachment without due process, as was the case in <u>Doehr</u> and <u>Reardon</u>, but the transfer of property held by one party to a <u>different</u> party and the imposition of a different (and allegedly more onerous) reimbursement procedure.

In their takings claim, Plaintiffs claim that the procedure to obtain reimbursement, Procedure No. 96, is so onerous that the change in procedure is, in effect, a "spurious escheat." Here, they also claim that the transfer constitutes a "spurious escheat," but provide no briefing on whether the alleged deprivation (change in trustee plus a change in procedure) constitutes a sufficient deprivation for purposes of the Due Process Clause. Defendants also provide no briefing on whether the transfers here result in a deprivation of constitutional significance. They only argue that any notice here was adequate. Finally, as noted above, the district court did not reach the issue.

-29-

Given the lack of briefing and the district court's silence on this issue, we conclude that the more prudent course is to remand to the district court for further proceedings to determine whether the transfers of the duplicate premiums mandated by Law 230 constitute a sufficient deprivation for purposes of the Due Process Clause.

### C.  The Equal Protection Claim

In addition to their due process challenge, Plaintiffs contend that the district court erred with respect to their equal protection claim.  The district court dismissed the claim in a footnote, stating that it "finds without merit Plaintiffs' undeveloped arguments that the Secretary's action . . . violates their rights to equal protection." García-Rubiera, 516 F. Supp. 2d at 188 n.10.

Plaintiffs fare no better here.  Plaintiffs claim that they were "singled out" as payers of the duplicate premiums to address the shortfalls in the Commonwealth's budget.  "When social or economic legislation is at issue, the Equal Protection Clause allows the States wide latitude . . . and the Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes." City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 440 (1985) (internal citations omitted). Accordingly, in cases that do not involve a protected class, "the Equal Protection Clause requires only a rational means to serve a

legitimate end." Id. at 442. Neither Law 230 nor Law 414 is directed to a protected class, and the Commonwealth's actions in transferring and using the funds, whatever their merit, is certainly rational, serving the legitimate end of balancing the budget. Thus, no equal protection violation occurred.

### D. Qualified Immunity

Plaintiffs additionally claim that the district court erred in finding that Defendants were entitled to qualified immunity as to Plaintiffs' claims for compensatory damages against the Defendants in their personal capacities under 42 U.S.C. § 1983. We review the district court's allowance of qualified immunity de novo. Jennings v. Jones, 499 F.3d 2, 10 (1st Cir. 2007).

To determine qualified immunity, we have "typically applied . . . a three part test in which we inquire:"

> (1) whether the claimant has alleged the deprivation of an actual constitutional right;
> (2) whether the right was clearly established at the time of the alleged action or inaction; and
> (3) if both of these questions are answered in the affirmative, whether an objectively reasonable official would have believed that the action taken violated that clearly established constitutional right.

Id. (quoting Starlight Sugar, Inc. v. Soto, 253 F.3d 137, 141 (1st Cir. 2001)).

In its order the district court ultimately found that Defendants were entitled to qualified immunity. As to the first prong, the district court found that Plaintiffs' amended complaint

-31-

sufficiently alleged a due process claim and a takings claim with respect to the interest earned by the duplicate premiums, finding earlier that Plaintiffs' takings claim with respect to the duplicate premiums was not ripe. García-Rubiera, 516 F. Supp. 2d at 192-93. However, as to the second prong, the district court relied upon our finding in Flores Galarza that "after enactment of [Law 230], which specifically required the JUA to transfer to the Secretary all funds held in the Reserve as of December 31, 2001, the law did not clearly establish . . . that withholding any of the designated Reserve . . . [and the interest it generates] was an unconstitutional taking." Id. at 193 (quoting Flores Galarza, 484 F.3d at 35) (emphasis in original). Moreover, the district court held that, "[r]egarding Plaintiffs' procedural due process claim, the law was not clearly established that to the effect that the custodial transfer of funds pursuant to a Commonwealth statute and the provision of a compensation procedure did not comport with due process requirements." Id. at 193-94. As to the third prong, the district court relied upon our finding in Flores Galarza that "a reasonable officer in [the Secretary's] circumstances would have believed that he had a law mandate, stemming from [Law 230], to retain for use by the Department of Treasury the Reserve Fund recognized by JUA as of December 31, 2001. Any officer in his shoes would have acted as he did in immediately retaining the full Reserve Fund [and interest] without any compensation to the JUA [or

Plaintiffs]." Id. at 194 (quoting Flores Galarza, 484 F.3d at 36) (alterations in the original). Accordingly, the district court concluded that "[t]he same rationale applies to the takings and procedural due process claims asserted in this case." Id. Finally, the district court held that all of these findings applied equally to the Governor. Id. at 195.

We identify no error in the district court's analysis, and see no reason to revisit anything we previously determined in Flores Galarza. We only add that the conclusions we reached in Flores Galarza apply equally to Plaintiffs' takings claims with respect to the duplicate premiums. See Pearson v. Callahan, 129 S. Ct. 808, 818 (2009) (establishment of constitutional violation unnecessary when other prongs are established in order to find qualified immunity). Accordingly, we affirm the district court with respect to its grant of qualified immunity to Defendants.

### E. Class Certification

Plaintiffs finally challenge the denial of their motion to certify a class. We generally review the denial of class certification for abuse of discretion. See McKenna v. First Horizon Home Loan Corp., 475 F.3d 418, 422 (1st Cir. 2007). Any legal rulings are reviewed de novo. Tardiff v. Knox County, 365 F.3d 1, 4 (1st Cir. 2004).

Below, Plaintiffs moved to certify a class of "all motor vehicle owners [sic] residents of the Commonwealth of Puerto Rico

-33-

who during the years 1997 to 2007 have paid the compulsory motor vehicle insurance premiums and have also acquired traditional insurance and have not been reimbursed with the compulsory insurance premiums." García-Rubiera, 516 F. Supp. 2d at 198. The district court denied class certification because, having dismissed Plaintiffs' damage claims, the remaining claims for injunctive relief, if granted, would "affect all commonwealth motor vehicle owners equally." Id. Accordingly, the district court concluded that "[t]he class action device . . . is not the superior method of adjudicating Plaintiffs' claims," since "[c]lass certification in this case would serve no useful purpose." Id.

As an initial matter, although the district court did not directly address whether Plaintiffs satisfied the prerequisites of Rule 23(a), we note that they are easily satisfied here. As to numerosity, Plaintiffs estimate the class to be around 500,000, which they calculate based on the fact that JUA reserved amounts to reimburse on an estimate that 17% to 25% of all registered motor vehicle owners paid duplicate premiums, see Flores Galarza, 484 F.3d at 8-9, and that, according to Plaintiffs, there are three million registered motor vehicle owners. Although Plaintiffs do not provide a basis for their estimate of the total number of registered motor vehicle owners, we independently conclude that numerosity is satisfied. The money withheld by JUA for reimbursement ($20 million) as compared to the amount of the

duplicate premiums ($99 or $148) paid by motor vehicle owners shows that the total number of individuals in the class far exceeds the low threshold for numerosity. See Stewart v. Abraham, 275 F.3d 220, 226-27 (3d Cir. 2001) ("No minimum number of plaintiffs is required to maintain a suit as a class action, but generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met.") (citations omitted). Commonality and typicality are easily met as well, since there are "questions of law or fact common to the class," see Fed. R. Civ. P. 23(a)(2), and Plaintiffs' claims "arise[] from the same event or practice or course of conduct that gives rise to the claims of other class members, and . . . are based on the same legal theory." See In re Am. Med. Sys., Inc., 75 F.3d 1069, 1082 (6th Cir. 1996) (discussing typicality under Rule 23(a)(3), quoting 1 Herbert B. Newberg & Alba Conte, Newberg on Class Actions § 3.13 (3d ed. 1992)). And there is no reason to question the adequacy of representation in this case, see Fed. R. Civ. P. 23(a)(4) & 23(g), as Plaintiffs and counsel have diligently pursued their rights since enactment of Law 230.

That said, the district court committed legal error in denying class certification. To obtain certification of a class, Plaintiffs must establish the prerequisites of Rule 23(a) and fall within one of the categories of Rule 23(b). See Fed. R. Civ. P. 23(a)(1)-(4) & 23(b)(1)-(3); see also Smilow v. Southwestern Bell

<u>Mobile Sys., Inc.</u>, 323 F.3d 32, 38 (1st Cir. 2003). In addressing Plaintiffs' motion to certify a class, the district court applied Rule 23(b)(3), which requires Plaintiffs to show, among other things, that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). However, Rule 23(b)(3) applies to class actions solely asserting damage claims that do not otherwise fit within the other Rule 23(b) categories, <u>see</u> <u>Amchem Prods., Inc.</u> v. <u>Windsor</u>, 521 U.S. 591, 614-15 (1997), and all damages claims in this case were dismissed. Instead, class actions asserting injunctive relief, as the one here, fit under Rule 23(b)(2), which applies when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief . . . is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2); <u>see also</u> <u>Robinson</u> v. <u>Metro-North Commuter R.R. Co.</u>, 267 F.3d 147, 162 (2d Cir. 2001) (Rule 23(b)(2) "is intended for cases where broad, class-wide injunctive or declaratory relief is necessary to redress a group-wide injury."). Unlike Rule 23(b)(3), Rule 23(b)(2) has no superiority requirement. Because the district court denied Plaintiffs' motion for class certification based on a requirement that did not apply, it committed reversible legal error.

Accordingly, we reverse the district court's denial of Plaintiffs' motion for class certification and, having found that

Plaintiffs have satisfied all of the requirements necessary to certify a class, we direct the district court to certify one consistent with this opinion.

### III.  Conclusion

In sum, we **reverse** the district court and hold that Plaintiffs' takings claim for declaratory and injunctive relief is ripe. With respect to Plaintiffs' due process claim, we **remand** for further proceedings consistent with this opinion. We **affirm** the denial of Plaintiffs' equal protection claim.  We **affirm** the district court's dismissal of Plaintiffs' compensatory damages claims on qualified immunity grounds.  Finally, we **reverse** the district court's denial of class certification and **remand** directing the district court to certify a class consistent with this opinion.

**Affirmed-in-part, reversed-in-part, and remanded for further proceedings consistent with this opinion**. **Each side shall bear their own costs.**