LAURA TAYLOR SWAIN, United States District Judge
Before the Court is Defendants' Motion to Dismiss Plaintiff's Amended Complaint Pursuant to Fed. R. Civ. P. 12 (b)(1) and (b)(6) (Docket Entry[3] No. 48 (the "Motion") ).[4] The Court heard argument on the *275 instant Motion on November 21, 2017, and has considered carefully all of the arguments and submissions made in connection with the Motion. Except as explained below, the Court has subject matter jurisdiction of this action pursuant to 48 U.S.C. § 2166. For the following reasons, Defendants' motion is granted. Plaintiff's Second Claim for Relief is dismissed pursuant to Federal Rule of Civil Procedure 12(b)(1). The First and Fourth Claims for Relief are dismissed pursuant to Rule 12(b)(1) to the extent they seek to invalidate the Fiscal Plan[5] on the basis of noncompliance with certification-related provisions of PROMESA or challenge the Oversight Board's certification decision, and are dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6) in all other respects. Plaintiff's Fifth and Sixth Claims for Relief is granted pursuant to Rule 12(b)(6). The Seventh Claim for Relief is dismissed pursuant to Rule 12(b)(6) to the extent that Claim for Relief is premised on a claim of outright PRHTA Bondholder ownership or trust beneficiary status as to the funds in the Reserve Accounts and is dismissed pursuant to Rule 12(b)(1) to the extent it is premised on a lien on the Reserve Accounts. Plaintiff has withdrawn its Third Claim for Relief, which alleged denial of access to Article III courts. (See Docket Entry No. 74 (the "Opposition") at n. 4.)
I.
BACKGROUND
The following recitation of facts is drawn from Plaintiff's Amended Complaint (Docket Entry No. 35, the "Amended Complaint"), except where otherwise noted.
Plaintiff is a financial guarantee insurer that has insured certain bonds issued by the Puerto Rico Highways and Transportation Authority ("PRHTA"). (Am. Compl. ¶ 42.) Additionally, Plaintiff directly owns approximately $16 million in bonds issued by PRHTA. (Id. ¶ 44.) Plaintiff alleges that PRHTA Revenue Bondholders, which include Plaintiff, "purchased their bonds, and [Plaintiff] insured the bonds, based on ironclad contractual agreements." (Id. ¶ 176.)
PRHTA was created in 1965 pursuant to Act No. 74-1965 (the "Enabling Act") to, among other things, oversee and manage the development of roads and various means of transportation in the Commonwealth of Puerto Rico (the "Commonwealth" or "Puerto Rico"). (Id. ¶ 45; see generally 9 L.P.R.A. § 2002.) PRHTA issued several series of bonds (the "PRHTA Bonds") pursuant to Resolution No. 68-18 (docket entry no. 51-4, the "1968 Resolution") and Resolution No. 98-06 (docket entry no. 51-5, the "1998 Resolution" and, together with the 1968 Resolution, the "Resolutions"). Plaintiff asserts that the PRHTA Bonds are secured by liens on (i) the revenues derived from PRHTA's toll facilities (the "Pledged Toll Revenues"); (ii) gasoline, diesel, crude oil, and other special excise taxes levied by the Commonwealth (the "PRHTA Pledged Tax Revenues"); and (iii) special excise taxes *276 consisting of motor vehicle license fees collected by the Commonwealth (the "Vehicle Fees," together with the PRHTA Pledged Tax Revenues, the "PRHTA Pledged Special Excise Taxes" and, collectively, the "Pledged Special Revenues"). (Id. at 46.)
The PRHTA Resolutions establish sinking funds (collectively, the "Sinking Funds"). (Resolutions § 401.) Each Sinking Fund includes three separate accounts (the "Accounts"): (i) a bond service account, (ii) a redemption account, and (iii) a reserve account. (Id. ) Pursuant to the Resolutions, PRHTA is required to deposit Pledged Special Revenues on a monthly basis with the fiscal agent. (Am. Compl. ¶ 208; Resolutions § 401.) Once the revenues are received, the fiscal agent is required to deposit the funds in the Accounts based on a protocol set forth in the Resolutions. (Resolutions § 401.)
On April 6, 2016, the Governor of the Commonwealth[6] signed into law the Puerto Rico Emergency Moratorium and Financial Rehabilitation Act (Act No. 21-2016, the "Moratorium Act").[7] (Am. Compl. ¶ 85.) The Moratorium Act recited that it was enacted to address the "desperate" fiscal emergency facing the Commonwealth and to avoid the "potential catastrophic effects of allowing creditors to exercise their enforcement remedies," which "would undeniably harm the health, safety and welfare of the residents of the Commonwealth." (Moratorium Act § 102.) The Moratorium Act authorized the Governor to declare a "state of emergency" over any governmental entity of the Commonwealth. (Am. Compl. ¶ 85 (citing Moratorium Act § 201(a) ).) Upon the declaration of a state of emergency, the Moratorium Act authorized the Governor to, among other things, "prioritize payment of 'essential services' over 'covered obligations.' " (Id. ¶ 86.) A "[c]overed obligation" included, in relevant part, "any interest obligation [or] principal obligation ... of a government entity" that became due before the Moratorium Act expired. (Id. ¶ 88 (citing Moratorium Act § 103(l) ).) If a state of emergency was declared with respect to a government entity, the Covered Obligations of such government entity could be suspended. (Id. (citing Moratorium Act §§ 103(l), 201(b) ).) Section 201(b) of the Moratorium Act granted the Governor the power to impose a stay on creditor remedies during the covered period. (Id. ¶ 89.)
Following the enactment of the Moratorium Act, the Governor issued a series of executive orders (collectively, the "Moratorium Orders") that Plaintiff asserts declared moratoriums on the PRHTA Bonds. (Id. ¶¶ 5, 96.) Specifically, on May 17, 2016, the Governor issued an executive order (docket entry no. 35-3, "Executive Order 18") declaring a state of emergency over PRHTA until June 30, 2016, stopped the flow of certain revenues to the PRHTA Revenue Bonds, and stayed all litigation arising from nonpayment of the PRHTA covered obligations. (Id. ¶ 96.) On June 30, 2016, the Governor issued an executive order (docket entry no. 35-4, "Executive Order 30") that, among other things, extended the PRHTA state of emergency *277 until January 31, 2017. (Id. ) Also, on June 30, 2016, the Governor issued another executive order (docket entry no. 35-5, "Executive Order 31") that, among other things, suspended the Commonwealth's obligation to transfer certain revenues to PRHTA. (Id. )
In 2016, Congress passed, and the President signed into law, the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA")[8] to address a "fiscal emergency" that had been created in Puerto Rico as a result of "a combination of severe economic decline, and, at times, accumulated operating deficits, lack of financial transparency, management inefficiencies and excessive borrowing." 48 U.S.C.S. § 2194(m)(1) (LexisNexis 2017). As a result of this fiscal emergency, Congress found, "the Government of Puerto Rico [was] unable to provide its citizens with effective services." Id. § 2194(m)(2). PROMESA provides, among other things, statutory authority pursuant to which the Commonwealth and its instrumentalities may seek to modify and restructure their debts. See id. § 2194(n). Pursuant to PROMESA, a Financial Oversight and Management Board (the "Oversight Board") was established with the purpose of developing "a method [for the Commonwealth] to achieve fiscal responsibility and access to capital markets." Id. § 101(a). Among other things, PROMESA establishes (i) a process for the Oversight Board to approve fiscal plans and budgets of the Commonwealth and its instrumentalities, including PRHTA; (ii) a process for the Oversight Board to file bankruptcy-type petitions on behalf of the Commonwealth and its instrumentalities, including PRHTA; and (iii) an alternative mechanism for adjusting the Commonwealth's bond debt or the bond debt of its instrumentalities outside of a bankruptcy proceeding. (Am. Compl. ¶¶ 98, 100-101, 152.) The Oversight Board has thus far certified, as relevant here, a fiscal plan for the Commonwealth (attached as "Exhibit A" to the Amended Complaint, the "Fiscal Plan"). (Id. ¶ 160.) Following the enactment of PROMESA, Puerto Rico's Amended Moratorium Act imposed measures "functionally" identical to the provisions of the Moratorium Act and continued the Moratorium Orders in full force and effect. (Id. ¶¶ 104-105.)
On February 28, 2017, the Governor's administration and the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF") submitted an initial fiscal plan (the "February 28 Fiscal Plan") to the Oversight Board. (Id. ¶ 156.) On March 9, 2017, the Oversight Board rejected the February 28 Fiscal Plan on the ground that it understated the Commonwealth's expenditures. (Id. ¶ 157.) On March 11, 2017, the Governor's administration and AAFAF submitted a revised fiscal plan. (Id. ¶ 158.) The Oversight Board certified the revised Fiscal Plan on March 13, 2017. (Id. ¶ 160.) On or about April 28, 2017, the Puerto Rico Legislative Assembly enacted the "Fiscal Plan Compliance Act" (attached as "Exhibit B" to the Amended Complaint). (Id. ¶ 10.) The Fiscal Plan Compliance Act "adjust[s] the existing legal and juridical framework [of Puerto Rico] to ensure full compliance with the Fiscal Plan ...." (Fiscal Plan Compliance Act at 1.) The Oversight Board commenced Title III proceedings with respect to the Commonwealth on May 3, 2017, and with respect to PRHTA on May 21, 2017. (Am. Compl. ¶ 101.)
On June 20 2017, AAFAF, on behalf of PRHTA, delivered an instruction to the Bank of New York Mellon ("BNYM"), as Fiscal Agent, instructing BNYM to "refrain *278 from making the scheduled July 1, 2017 payment to the Bondholders from the [Reserve] Account" and asserting that any such payment would constitute "an act to exercise control" over PRHTA's property in violation of the automatic stay that arose under 11 U.S.C. § 362(a), as incorporated by Section 301 of PROMESA, upon the filing of PRHTA's Title III petition.[9] Following the delivery of the instruction, on July 3, 2017, PRHTA defaulted on a scheduled bond payment in the amount of $219 million. (Id. ¶ 211.) As a result, Plaintiff paid claims under the governing insurance policy totaling approximately $52 million to the holders of PRHTA Bonds (the "PRHTA Bondholders"). (Id. )
II.
DISCUSSION
Defendants move pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) to dismiss Plaintiff's Amended Complaint for lack of subject matter jurisdiction and for failure to state a claim upon which relief may be granted. A court presented with motions to dismiss under both Rules 12(b)(1) and 12(b)(6) should ordinarily decide jurisdictional questions before addressing the merits. Deniz v. Municipality of Guaynabo, 285 F.3d 142, 149 (1st Cir. 2002). The party invoking the jurisdiction of a federal court carries the burden of proving its existence. Johansen v. United States, 506 F.3d 65, 68 (1st Cir. 2007). The Court also has an independent duty to assess whether it has subject matter jurisdiction of an action. See Fed. R. Civ. P. 12(h)(3) ; FW/PBS, Inc. v. City of Dallas, 493 U.S. 215, 231, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990).
A. Rule 12(b)(1) : Subject Matter Jurisdiction
1. Redressable Injury
Defendants move to dismiss the Amended Complaint pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction. Specifically, Defendants assert that Plaintiff lacks standing to bring this action because Plaintiff has not suffered a concrete injury, as its rights, and any impairment of those rights, will not be determined until a plan of adjustment is proposed. (See Opening Br. at 17-18.) In support of that assertion, Defendants contend that (i) the Fiscal Plan and the Fiscal Plan Compliance Law do not discharge debt or eliminate liens, (ii) the Fiscal Plan serves merely as a "blueprint" or "business plan," and (iii) Plaintiff has not and cannot plead any distinct injury due to the Moratorium Legislation and Moratorium Orders because Plaintiff admits that it was being paid from reserve accounts at the time it commenced this action. (See id.; see also Reply Br. at 6-9.) Plaintiff asserts that it has standing and has suffered a concrete, particularized injury because the Fiscal Plan and the Fiscal Plan Compliance Act mandate that funds that were previously earmarked for payment of PRHTA bonds or that would otherwise service PRHTA's debts have been used for other, legally subordinate, purposes or diverted to the Commonwealth's General Funds and that, on July 3, 2017, PRHTA defaulted on a $219 million bond payment, causing Plaintiff to pay $52 million in claims on certain financial guaranty insurance policies, as a result of the clawbacks effected through the Moratorium Orders and Moratorium Legislation.[10] (See Pl.'s Br. at 17-18.) For the following reasons, *279 the Court concludes that Plaintiff has sufficiently pled a redressable injury.
In resolving a Rule 12(b)(1) motion to dismiss an action for lack of standing, the Court must "credit the plaintiff's well-pled factual allegations and draw all reasonable inferences in the plaintiff's favor." Sanchez ex rel. D.R.-S. v. United States, 671 F.3d 86, 92 (1st Cir. 2012). To demonstrate constitutional standing, a plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. Spokeo, Inc. v. Robins, --- U.S. ----, 136 S.Ct. 1540, 1547, 194 L.Ed.2d 635 (2016). Plaintiff, as "[t]he party invoking federal jurisdiction[,] bears the burden of establishing these elements." Lujan v. Defs. of Wildlife, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).
Here, Plaintiff alleges that (i) funds that were originally available to service PRHTA's debt have been diverted as a result of the Fiscal Plan and Fiscal Plan Compliance Act, (ii) subordinate or junior obligations will effectively be afforded priority over PRHTA debt, (iii) Plaintiff insures certain PRHTA debt, (iv) a default has already occurred, and (v) Plaintiff has paid out claims due to such default. (See Am. Compl. ¶¶ 40, 168-70, 211.) Crediting these factual allegations, and drawing "all reasonable inferences in [Plaintiff's] favor," the Court finds that, for the purposes of a constitutional standing analysis, Plaintiff has sufficiently pled that it has suffered an injury-in-fact, and that the harm is fairly traceable to the Fiscal Plan, Fiscal Plan Compliance Act, Moratorium Orders, and Moratorium Legislation, and the consequences of the respective actions, and that injury is likely to be redressed by a favorable judicial decision in this action. See Sanchez, 671 F.3d at 92 ; Spokeo, 136 S.Ct. at 1547.
Defendants' motion to dismiss the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(1) is therefore denied insofar as it is premised on lack of standing.
2. Case or Controversy Requirement
In its Seventh Claim for Relief, Plaintiff alleges that all of the funds held in the Reserve Accounts "are property of the [PR]HTA Revenue Bondholders, held in trust for their benefit, and subject to a lien in their favor," and seeks declarations that all funds in the Reserve Accounts are property of the PRHTA Bondholders and that PRHTA "lacks an interest sufficient to prevent funds held in the Reserve Accounts from flowing to the [PR]HTA Revenue Bondholders, unless and until all outstanding [PR]HTA Revenue Bonds have been fully retired or defeased." (Am. Compl ¶¶ 255, 260.) This Claim for Relief appears to be premised on three different theories of bondholder interests in the Reserve Account-that the bondholders are the direct owners of the funds therein, that the funds are held in trust under terms that exclude cognizable property interests of PRHTA in those funds, and that the funds are property of PRHTA but subject to a lien in favor of the PRHTA Bondholders.
Article III, Section 2 of the Constitution of the United States limits the exercise of federal judicial power to actual cases and controversies. U.S. Const. art. III, § 2; Aetna Life Ins. Co. of Hartford, Conn. v. Haworth, 300 U.S. 227, 239-41, 57 S.Ct. 461, 81 L.Ed. 617 (1937). The authority conferred on federal courts by the Declaratory Judgment Act, 28 U.S.C. § 2201, is likewise limited to controversies that are within the constitutionally-constrained scope of federal jurisdiction. Aetna, 300 U.S. at 240, 57 S.Ct. 461. A justiciable controversy must be "a real and substantial *280 controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion what the law would be upon a hypothetical state of facts." Aetna, 300 U.S. at 241, 57 S.Ct. 461. Federal courts are not empowered to issue advisory opinions where there is no actual controversy of this nature. See id.; Golden v. Zwickler, 394 U.S. 103, 108, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969) ; Shell Oil Co. v. Noel, 608 F.2d 208, 213 (1st Cir. 1979).
The constitutional requirement that controversies be justiciable and admit of specific relief through a decree of a conclusive character requires more than strong or even significant disagreement, however high the stakes, to obtain declaratory relief. The issue must be raised, and the relief sought, in a fashion that would address a specific live controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment. See Golden, 394 U.S. at 108, 110, 89 S.Ct. 956. Rulings on isolated or abstract principles that will merely be useful in formulating or litigating future choices that might or might not be made are outside the authorized scope of declaratory relief.
Plaintiff's Seventh Claim for Relief presents justiciable issues that are capable of conclusively resolving its issue regarding PRHTA's right to prohibit disbursement of the Reserve Account to the extent Plaintiff asserts that PRHTA has insufficient property interests to prevent the payments, although PROMESA Section 305's limitations on the Court's powers to grant relief may ultimately impede Ambac's ability to state a claim upon which relief may be granted. To the extent, however, its claim of rights in the account is limited to a lien on property of PRHTA, Ambac has neither alleged facts nor proffered a legal theory that would entitle it to a determination that the parties' respective property interests are such as to preclude PRHTA from preventing disbursement of the funds. A determination of the nature or extent of any PRHTA lien interest would therefore be merely advisory, requiring further facts and litigation to ascertain its impact, if any, on rights to control disbursements from the Reserve Account. The Court concludes that it lacks subject matter jurisdiction of the Seventh Claim for Relief to the extent that claim is premised solely on Plaintiff's assertion of a lien interest in the Reserve Account funds. A determination of the lien interest, standing alone, will not resolve conclusively the question of whether, when and from what, if any, funds the PRHTA bondholders are entitled to be paid. Such lien-related issues may ripen in other respects in the future in connection, for instance, with claims and objections to claims, and litigation concerning confirmation of a plan of adjustment.
3. Ripeness Requirement (Second Claim for Relief)
In the Second Claim for Relief, Plaintiff asserts that the Fiscal Plan, Fiscal Plan Compliance Act, Moratorium Legislation and Moratorium Orders (each a "Challenged Action," and collectively, the "Challenged Actions") violate the Takings and Due Process Clauses of the Constitution of the United States by depriving Plaintiff and the PRHTA Revenue Bondholders of their senior secured property interests in the PRHTA Pledged Special Revenues without providing Plaintiff and the PRHTA Bondholders with due process or just compensation. Specifically, Plaintiff alleges that the "[PRHTA] Pledged Special Revenues may legally be clawed back only to pay [General Obligation ("GO") ] Debt and only when no other resources are available." (See Am. Compl. ¶¶ 125, 184-86 (emphasis omitted).) Accordingly, Plaintiff seeks "an order declaring (i) that the [Challenged Actions] are unconstitutional on the grounds that each violates the Fifth and Fourteenth Amendments of the U.S.
*281 Constitution; and (ii) that the [Challenged Actions] are unlawful, invalid, null, and void," as well as "injunctive relief invalidating the Oversight Board's certification of the Fiscal Plan and prohibiting the Defendants from taking or causing to be taken any action pursuant to" the Challenged Actions. (Id. ¶¶ 223, 226.) Defendants assert that the Court lacks subject matter jurisdiction of the Takings Clause claim for relief because it is not ripe for adjudication. (See Opening Br. at 7, 17-18.) Defendants also argue that, as "Plaintiff has not independently pled a due process claim except in terms identical to its [T]akings allegations," Plaintiff's Due Process Clause Claim must also fail. (Id. at 40-41.)
The Takings Clause provides that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V. The Takings Clause applies to the States, and the Commonwealth, by virtue of Section 1 of the Fourteenth Amendment to the U.S. Constitution. U.S. Const. amend. XIV, § 1. The Constitution also forbids government deprivation of property without due process of law. See U.S. Const. amend. V ; see also U.S. Const. amend. XIV, § 1.
Ripeness "has roots in both the Article III case or controversy requirement and in prudential considerations." Reddy v. Foster, 845 F.3d 493, 500 (1st Cir. 2017) (internal quotation marks and citation omitted). The doctrine "seeks to prevent the adjudication of claims relating to contingent future events that may not occur as anticipated, or indeed may not occur at all." Id. In the First Circuit, "a plaintiff asserting a takings claim must demonstrate [both] that (1) he or she received a final decision from the state on the use of his [or her] property, and (2) sought compensation through the procedures the State has provided for doing so." Garcia-Rubiera v. Calderon, 570 F.3d 443, 451 (1st Cir. 2009) (internal quotation marks and citation omitted). "[A] [p]laintiff[ ] ha[s] the burden of demonstrating ripeness." Id. (internal quotation marks and citation omitted).
Plaintiff has failed to carry its burden here. Specifically, Plaintiff has failed to demonstrate that it has "received a final decision from the state" regarding any alleged "taking" of its property. See id. The "finality prong" addresses "whether the initial decisionmaker has arrived at a definitive position on the issue that inflicts an actual, concrete injury." Id. at 452 (quotation marks and citation omitted) (emphasis in original). First Circuit precedent calls for a " 'focus[ ] on whether the administrative body responsible for applying the challenged regulations has completed discretionary review of the plaintiff's particular situation[,]' " and whether there is a " 'pending administrative process that could ... modify the statute's impact on the' " plaintiff. Id. (quoting Asociación De Subscripción Conjunta Del Seguro De Responsibilidad Obligatorio v. Flores Galarza, 484 F.3d 1, 15 (1st Cir. 2007) ).
Plaintiff does not, and could not, allege that the Commonwealth, through any of the Challenged Actions, "has arrived at a definitive position" regarding any disbursement of funds that may "inflict[ ] an actual, concrete injury" upon them that is sufficient to support a ripe Takings Clause claim. See id. Here, the clawback retention is not a final resolution of the disposition of the contested revenues or of Ambac's and the PRHTA Bondholders' asserted lien rights. PROMESA Title III contemplates that the Oversight Board will propound plans of adjustment for the Commonwealth and PRHTA. Those plans will address the ultimate disposition of the contested revenues and the payments, if any, to be received by the bondholders and other creditors. Any challenges to those *282 plans will be considered and determined in connection with efforts to confirm those plans. The particulars of any plans of adjustment, and the specific issues that will be addressed throughout the process by which any such plans will be developed and confirmed, are not yet determined. The effect of the Challenged Actions on Plaintiff thus could be modified and there has been no definitive position.
Garcia-Rubiera does not require the Court to reach a different result. There, plaintiffs challenged the constitutionality of a law that required Puerto Rican motor vehicle owners to pay annual premiums for compulsory car insurance at the time of acquisition or renewal of vehicle registration, and the premiums, which were initially collected by the Secretary of the Treasury, were then transferred to a Commonwealth-created association of all private insurers in Puerto Rico (the "JUA"), who ultimately provided the car insurance. See id., 570 F.3d at 447. The Commonwealth enacted legislation under which the JUA was required to transfer certain of the premiums back to the Commonwealth, and the Commonwealth was entitled to use interest earned on the monies as it accrued. Id. at 448-49. The Commonwealth provided a procedure under which motor vehicle owners could seek reimbursement of duplicative premiums from the Commonwealth. Id. at 449. Further legislation permitted the Commonwealth to use more of the transferred funds. Id. at 450. The insurance premium and interest diversion at issue in Garcia-Rubiera was accomplished under a finalized statutory structure and a settlement of which no further modification was contemplated. See id. at 447-50. Here, by contrast, the Commonwealth and PRHTA are in the early stages of a process that will culminate in efforts to confirm as-yet-to-be-formulated plans of adjustment. Because Plaintiff's Takings Clause claim does not satisfy the first prong of the ripeness analysis, there is no need for the Court to consider whether Ambac has met the "just compensation" prong of its burden of demonstrating that its claim is ripe for adjudication. For the foregoing reasons, Plaintiff's Takings Clause claim is not yet ripe and does not meet the Article III case or controversy requirement; thus, it is not justiciable. See Garcia-Rubiera, 570 F.3d at 452.
Plaintiff also alleges violations of the Due Process Clause and, in support of those claims, alleges facts identical to those alleged in support of its Takings Clause claim, and asserts that its Due Process claim sounds in procedural due process, arguing that Plaintiff was not provided a pre-deprivation opportunity to be heard prior to the implementation of the revenue diversion actions at issue here. (See Am. Compl. ¶¶ 220-27; Pl.'s Br. at 47-48.) It appears that Plaintiff's procedural due process claim is an attempt to evade the predicates for a Takings Clause claim, which, as discussed above, require a "final decision" and the denial of "just compensation." Downing/Salt Pond Partners, L.P. v. Rhode Island & Providence Plantations, 643 F.3d 16, 27-28 (1st Cir. 2011). The Court declines to address this claim separately. For substantially the reasons discussed above, the Due Process claim is not ripe.
The Court thus lacks subject matter jurisdiction of Plaintiff's Second Claim for Relief, and this Claim is dismissed pursuant to Federal Rule of Civil Procedure 12(b)(1).
4. Limitations on Jurisdiction Under PROMESA Sections 106(e) and 305
Defendants argue that the Court lacks subject matter jurisdiction of Plaintiff's Fourth, Fifth and Sixth Claims for Relief because Section 106(e) of PROMESA deprives the Court of jurisdiction to entertain *283 challenges to Oversight Board certification of Fiscal Plans, and Section 305 of PROMESA denies the Court jurisdiction of litigation seeking to interfere with the Debtors' governmental functions, property and revenues. (Mot. at 18 -25.)
a. PROMESA Section 106(e)
Section 106(e) of PROMESA provides that:
There shall be no jurisdiction in any United States district court to review challenges to the Oversight Board's certification determinations under this Act.
48 U.S.C.S. § 2126(e) (LexisNexis 2017). Defendants assert that the Court lacks subject matter jurisdiction of Plaintiff's First, Second, Fourth, Fifth and Sixth Claims for Relief insofar as they explicitly or implicitly seek invalidation of the certification of the Fiscal Plan, arguing that Section 106(e) of PROMESA divests the Court of jurisdiction "because those claims challenge the [Oversight Board's] decision to certify the Fiscal Plan." (Mot. at 18; see also FOMB Reply at 3.) Plaintiff argues that Section 106(e) should be narrowly construed to apply only to claims against the Oversight Board that constitute direct challenges of the Oversight Board's certification decisions and contends that, "[a]t most, [the] limitation on subject matter jurisdiction applies only to a narrow slice of the claims-that portion of the Fourth Claim for Relief that seeks invalidation of the Oversight Board's certification of the Fiscal Plan." (Opp'n at 19-20.)
Section 201(b) of PROMESA identifies fourteen specific objectives and requirements that a fiscal plan, whose development is overseen by the Oversight Board, must satisfy. The Oversight Board, pursuant to Section 201(c)(3) of PROMESA, is specifically tasked with reviewing and approving proposed fiscal plans and is granted "sole discretion" to determine in connection with such certification whether such fiscal plans satisfy the Section 201(b) requirements. PROMESA not only grants the Oversight Board exclusive authority to certify fiscal plans, but it also insulates the Oversight Board's certification determinations, which necessarily rest on determinations that the Section 201(b) requirements have been met, from challenge by denying all federal district courts jurisdiction to review such challenges. See PROMESA § 106(e). To be meaningful, denial of jurisdiction to review the certification of the Fiscal Plan thus must be understood preclude the review of claims that particular aspects of the Fiscal Plan are noncompliant with Section 201(b) requirements.
The First, Second, and Fourth Claims for Relief of the Amended Complaint expressly seek invalidation of the Oversight Board's certification of the Fiscal Plan and injunctive relief prohibiting Defendants from taking or causing to be taken any action pursuant to the Fiscal Plan. (Am. Compl. ¶¶ 215, 218, 223, 226, 236, 239.) To the extent these claims rest on contentions that the Fiscal Plan violates Section 201(b) specifications, such as the requirement that a fiscal plan respect lawful priorities or lawful liens under territorial law, this requested relief necessarily implicates review of the Fiscal Plan's certification and therefore the Court lacks subject matter jurisdiction to consider the merits of the claims.
Congress has entrusted the ultimate decision to certify a fiscal plan to the sole discretion of the Oversight Board. See PROMESA § 201(c)(3). PROMESA creates a statutory structure that is protective of the Oversight Board's authority under Section 312(a) of PROMESA, which grants the Oversight Board the exclusive right to propose a Title III plan of adjustment that must be consistent with the applicable certified Fiscal Plan to be eligible for confirmation. Together, these provisions underscore *284 the central, discretionary role that Congress has assigned to the Oversight Board in the Title III debt adjustment process. See PROMESA § 314(b)(7). Under PROMESA's statutory framework, it is only at the plan confirmation stage that the Court determines whether a proposed plan of adjustment complies with, among other things, the provisions of Title 11 of the United States Code which have been made applicable to these cases by Section 301 of PROMESA and the relevant provisions of PROMESA. See PROMESA § 314.
Therefore, the Court lacks subject matter jurisdiction to entertain the First, Second and Fourth Claims for Relief to the extent they, implicitly or explicitly, seek invalidation of the certification of the Fiscal Plan and prohibition of actions that could not be taken under PROMESA absent such certification, for non-compliance with PROMESA requirements that constitute predicates to certification, and those claims for relief are dismissed pursuant to Rule 12(b)(1) to that extent. Section 106(e) does not, however, deprive the Court of jurisdiction to entertain Plaintiff's claims that the Fiscal Plan is invalid or unenforceable as violative of the Contracts, Takings and Due Process Clauses of the federal Constitution. The Fifth and Sixth Claims for Relief are not implicated by Section 106(e) because they do not challenge the Oversight Board's certification of the Fiscal Plan or claim that PROMESA Fiscal Plan certification predicates have not been met. The Fifth and Sixth Claims for Relief are discussed infra in Sections B.3. and B.4. of this Opinion.
b. PROMESA Section 305
Section 305 of PROMESA provides that:
Subject to the limitations set forth in titles I and II of this Act, notwithstanding any power of the court, unless the Oversight Board consents or the plan so provides, the court may not, by any stay, order, or decree, in the case or otherwise, interfere with-
(1) any of the political or governmental powers of the debtor;
(2) any of the property or revenues of the debtor; or
(3) the use or enjoyment by the debtor of any income producing property.
48 U.S.C.S. § 2165 (LexisNexis 2017). As explained in this Court's January 30, 2018, decision dismissing the Amended Complaint in Assured Guaranty Corp. et al. v. Commonwealth of Puerto Rico et al. (see docket entry no. 125 in case no. 17-AP-155 and docket entry no. 121 in case no. 17-AP-156, "Assured"), Section 305 is not a jurisdictional provision but, rather, circumscribes a PROMESA Title III court's power to grant certain types of relief and so can preclude a litigant's ability to state a claim for the proscribed relief. Assured at 9-12.
The Court now turns to the merits issues presented by Plaintiff's remaining claims and the instant motion practice-whether Plaintiff has stated claims upon which relief may be granted.
B. Rule 12(b)(6) : Failure to State a Claim
To survive a motion to dismiss for failure to state a claim upon which relief can be granted under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). The Court accepts as true the non-conclusory factual allegations in the complaint and makes all reasonable inferences in the plaintiff's favor. Miss. Pub. Employees' Ret. Sys. v. Boston Scientific Corp., 523 F.3d 75, 85 (1st Cir. 2008). The court may "consider documents the authenticity of which are not disputed by the parties, documents central to the plaintiffs' claim, *285 and documents sufficiently referred to in the complaint." Id. (citing Curran v. Cousins, 509 F.3d 36, 44 (1st Cir. 2007) ). The complaint must allege enough factual content to nudge a claim "across the line from conceivable to plausible." Ashcroft v. Iqbal, 556 U.S. 662, 680, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citing Twombly, 550 U.S. at 570, 127 S.Ct. 1955 ).
1. First Claim for Relief: Contracts Clause
In its First Claim for Relief, Plaintiff asserts that Defendants have violated the Contracts Clause of Article I of the federal Constitution and, accordingly, seeks an order declaring that the Challenged Actions (i) are "unconstitutional on the grounds that ... each violates the Contracts Clause;" (ii) "unlawfully interfere with and impede Ambac's contractual rights," and (iii) "are unlawful, invalid, null, and void," as well as injunctive relief "invalidating the Oversight Board's certification of the Fiscal Plan and prohibiting Defendants from taking or causing to be taken any action pursuant to the [Challenged Actions]." (Am. Compl. ¶¶ 212-19.)
Defendants move to dismiss the claim on the merits in its entirety. They assert that "the Fiscal Plan and [Fiscal Plan Compliance Act] do not effectuate any impairment, discharge, or taking, and [thus] no constitutional claims exist," and further argue that, "[e]ven if they did, Ambac fails to state a claim as to the Fiscal Plan" and the Moratorium Orders "because the Contract[s] Clause applies only to state (or Commonwealth) legislation; it does not apply to non-legislative acts such as the Executive Orders or the [Oversight Board]'s certification of the Fiscal Plan or its commencement of the Title III case." (Mot. at 25.)
The Constitution provides that "[n]o State shall ... pass any ... Law impairing the Obligation of Contracts." U.S. Const. art. I, § 10, cl. 1 (the "Contracts Clause"). The Contracts Clause, by its terms, applies only to measures that are state laws. See, e.g., Arriaga v. Members of Bd. of Regents, 825 F.Supp. 1, 4 (D. Mass. 1992) (stating that, as "some exercise of legislative power is essential to implicate the Contracts Clause ..., actions solely by executive officers affecting contractual rights would not, unless constituting the exercise of a delegated legislative function, involve a potential violation of the Contracts Clause" (citations omitted) ) and cases cited therein. Defendants contend that the Fiscal Plan and the Moratorium Orders are executive actions not constituting any exercise of delegated legislative functions, and that Plaintiff thus cannot state a Contracts Clause claim with respect to those measures. Plaintiff's allegations with respect to the Fiscal Plan in this regard fail to identify any delegation or exercise of state legislative authority-the Amended Complaint alleges that the Oversight Board exercised powers "delegated to it by Section 201 of PROMESA," which is federal legislation and thus cannot have constituted a delegation by the Commonwealth's legislature, and that Commonwealth executive branch officials "submitted" the Fiscal Plan to the Oversight Board in some manner that constituted a delegated exercise of legislative power. (See Am. Compl. ¶ 177.) Aside from the conclusory assertion that the executive branch actions were an exercise of powers delegated by certain Commonwealth legislation, the Amended Complaint proffers no facts from which it could reasonably be inferred that submission of the Fiscal Plan to the Oversight Board constituted a lawmaking function. The Amended Complaint thus fails to allege plausibly that the Fiscal Plan is a state law within the meaning of the Contracts Clause.
Plaintiff does, however, allege plausibly that the Moratorium Orders constitute exercises *286 of delegated state legislative power and are therefore laws. The Amended Complaint includes allegations, consistent with the text of the Moratorium Law, that the legislation purported to "confer the Legislative Assembly's police power on the Governor, and when issuing the Moratorium Orders, the Governor purported to be exercising that police power." (Am. Compl. ¶ 113.) The Court will therefore turn to an analysis of whether the Amended Complaint states a cause of action for which relief may be granted pursuant to the Contracts Clause as to the Moratorium Orders, the Moratorium Laws, and the Fiscal Plan Compliance Act.
Though the language of the Contracts Clause is "unequivocal," it "does not make unlawful every state law that conflicts with any contract," and in considering claims brought under the Contracts Clause, courts must "reconcile the strictures of the Contract[s] Clause with the essential attributes of sovereign power necessarily reserved by the States to safeguard the welfare of their citizens." United Auto., Aero., Agric. Impl. Workers of Am. Int'l Union v. Fortuño, 633 F.3d 37, 41 (1st Cir. 2011) (internal quotation marks and citations omitted). In doing so, courts apply a two-pronged test: they examine first "whether the state law has operated as a substantial impairment of a contractual relationship," and then, if the law has, "whether the impairment was reasonable and necessary to serve an important government purpose." Id. When a plaintiff brings suit against a state or the Commonwealth for impairing a contract to which it is a party, the plaintiff bears the burden of pleading and proof as to both prongs of the Contracts Clause analysis. Id. at 43.
There are "three distinct parts" of a "substantial impairment" analysis: "whether there is a contractual relationship, whether a change in law impairs that contractual relationship, and whether the impairment is substantial." Mercado-Boneta v. Administracion del Fondo de Compensacion al Paciete Through Ins. Com'r of Puerto Rico, 125 F.3d 9, 13 (1st Cir. 1997) (quotation marks and citation omitted). "The first two parts of this inquiry are ... often easily satisfied" and, to determine just how "substantial" an impairment is, "courts look long and hard at the reasonable expectations of the parties." Houlton Citizens' Coal. v. Town of Houlton, 175 F.3d 178, 190 (1st Cir. 1999).
Once there is a determination that a state law has operated as a "substantial impairment," a court must analyze the reasonableness and necessity of the challenged state action. The First Circuit considers "the reasonableness inquiry" to "ask[ ] whether the law is reasonable in light of the surrounding circumstances," while "the necessity inquiry focuses on whether Puerto Rico imposed a drastic impairment when an evident and more moderate course would serve its purposes equally well." Fortuño, 633 F.3d at 45-46 (internal quotation marks, citations, and brackets omitted). In analyzing these questions, courts may consider "whether the act (1) was an emergency measure; (2) was one to protect a basic societal interest, rather than particular individuals; (3) was tailored appropriately to its purpose; (4) imposed reasonable conditions; and (5) was limited to the duration of the emergency." Id. at 46.
In Fortuño, a collection of labor organizations and public employees sued Governor Luis A. Fortuño, as well as a number of other government officials, claiming that an emergency law, styled Act No. 7 and "intended to eliminate Puerto Rico's $3.2 billion structural deficit," unlawfully impaired collective bargaining agreements and other employment-related contractual obligations by "la[ying] out a three-phase plan to reduce the government payroll."
*287 See 633 F.3d at 39-40. Among other claims, the Fortuño plaintiffs asserted that Act No. 7 violated the Contracts Clause. See id. Assuming "arguendo that the plaintiffs pled sufficient facts to satisfy the substantial impairment inquiry," the First Circuit held that the plaintiffs failed to plead "sufficient facts to allow a court to draw a reasonable inference that Act No. 7 was unreasonable or unnecessary to effectuate an important governmental purpose." See id. at 41-42, 45 (emphasis in original). In so holding, the Fortuño Court relied in part on the plaintiffs' failure to plead "any factual content" or allegations "to undermine the credibility of Act No. 7's statement that it was enacted to remedy a $3.2 billion deficit [or] to question the existence of the deficit or the 'basic societal interest' in eliminating it," as well as their failure to allege "facts demonstrating that Act No. 7 was an excessively drastic means of tackling the deficit." See id. at 46-47.
For purposes of the following analysis the Court assumes arguendo, as did the First Circuit in Fortuño, that Plaintiff has pled the requisite substantial impairment. The Court therefore turns to the reasonableness and necessity inquiries. See Fortuño, 633 F.3d at 41. To state a Contracts Clause claim, Plaintiff must have pled facts sufficient to support an inference that the Moratorium Legislation, Moratorium Orders, and Fiscal Plan Compliance Act are unreasonable or unnecessary to effectuate an important governmental purpose. See id. Accordingly, the Court examines Plaintiff's allegations in light of the factors set forth in Fortuño, beginning with the question of whether Plaintiff has pled facts sufficient to support an inference that the Fiscal Plan Compliance Act, Moratorium Legislation, and Moratorium Orders were not "emergency measures" enacted to "protect a basic societal interest, rather than particular individuals." See Fortuño, 633 F.3d at 46. Plaintiff acknowledges in the Amended Complaint that "[o]fficers and representatives of the Commonwealth, as well as the Legislative Assembly, have [ ] repeatedly stated that the Commonwealth is in a state of fiscal emergency."
The Moratorium Act recites that it was enacted to address the "unsustainable" fiscal emergency that is facing the Commonwealth and that "threatens its ability to honor its outstanding obligations while protecting the health, safety and welfare of the inhabitants of Puerto Rico." (Moratorium Act § 102.) PROMESA itself recites that it was enacted by Congress to address the real state of "fiscal emergency" that is currently facing the Commonwealth and, as Plaintiff acknowledges in the Amended Complaint, PROMESA was "intended 'to provide a method for a covered territory [including the Commonwealth] to achieve fiscal responsibility and access to the capital markets.' " (Id. ¶ 97 (quoting 48 U.S.C.A. §§ 2121(a), (b)(1) ).) As Congress acknowledged, the Commonwealth's exceptional fiscal situation resulted in the passage of PROMESA, an unprecedented action which seeks to "protect a basic societal interest."
In the Amended Complaint, Plaintiff alleges that the Commonwealth's officers and representatives are only acting "under cover of an emergency" to "engag[e] in a pattern of obstructive and destructive behavior" (Am. Compl. ¶¶ 73-74) but, like the plaintiffs in Fortuño, proffers no facts that undermine the Commonwealth officers' and representatives' representations of the existence of a fiscal emergency. Indeed, in its opposition to the Motion, Ambac acknowledges that it "does not gainsay the severity of the Commonwealth's fiscal crisis." (Opp. at 32.) No facts set forth in the Amended Complaint plausibly support an inference that the declarations of emergency conditions are mere subterfuges for nefarious conduct. Thus, Plaintiff has failed *288 to plead facts sufficient to "nudge" its claim that the Commonwealth's officers and representatives acted "under cover of an emergency" to "engag[e] in a pattern of obstructive and destructive behavior" from "conceivable to plausible." See Iqbal, 556 U.S. at 680, 129 S.Ct. 1937. Nor does Plaintiff plead facts sufficient to support an inference that the Moratorium Legislation, Moratorium Orders, and Fiscal Plan Compliance Act were enacted to protect "particular individuals" rather than "a basic societal interest." See Fortuño, 633 F.3d at 41-42, 45.
Plaintiff asserts in the Amended Complaint that the actions at issue in the First Claim for Relief "constitute neither a reasonable nor necessary means of serving an important public purpose, because many less drastic alternatives existed." (See Am. Compl. ¶¶ 122, 183). The plaintiffs in Fortuño similarly pled that "there were other available alternatives with lesser impact to the paramount constitutional rights affected," but the court there found that plaintiffs' failure to "specify any such alternatives or plead any factual content suggesting such alternatives might exist" rendered the pleading conclusory and thus insufficient to meet the plaintiffs' pleading burden. See 633 F.3d at 47. Plaintiff here similarly fails to plead any factual content suggesting that "other available alternatives with lesser impact to the paramount constitutional rights affected" might have existed that would ultimately have been "a more moderate course of action" that would serve the stated purposes of the relevant actions "equally well." See id. Plaintiff alleges that, as "the projected resources available to the Commonwealth ... vastly exceed[ ] debt service on GO Debt and the Revenue Bonds," the clawback of PRHTA Pledged Special Revenues, pursuant to the Moratorium Legislation and Moratorium Orders, was demonstrably neither necessary nor reasonable because the Commonwealth's "refus[al] to apply the clawed back [PR]HTA Pledged Special Revenues" confirms that the Commonwealth did not intend to prevent defaults on GO bonds, but, rather, it has "allow[ed] those exact defaults to occur." (See Am. Compl. ¶¶ 118-19.) Ambac asserts that debt service on the GO and PRHTA bonds could have been paid, with enough left over to address truly "essential" services without "significant impact." (Am. Compl. ¶¶ 118-119.) Plaintiff also alleges that the Moratorium Legislation and Moratorium Orders were not "narrowly tailored," as they "sweep in vast sums from across the Commonwealth," rather than "identifying select public corporations and discrete amounts of funds tied to specified debt relief goals," and because the Commonwealth failed to limit their temporal scope. (See id. ¶¶ 120-21.)
Plaintiff's narrow focus on the feasibility of GO and revenue bond debt service is inconsistent with the breadth of the fiscal, public health, safety, welfare and recovery concerns that combine to form the crisis the Challenged Actions purport to address. Plaintiff has not pled facts that support an inference that a "more moderate course of action" to marshaling revenue than the "sweep[ing] [of] vast sums from across the Commonwealth" would have both served the stated purposes of addressing the critical public health, safety, and welfare aspects of the crisis, as well as restoring the Commonwealth's, and its instrumentalities', access to the capital markets. See Fortuño, 633 F.3d at 47.
Plaintiff similarly attacks the diversion of the PRHTA Pledged Special Revenues pursuant to the Fiscal Plan Compliance Act as "not a necessary or reasonable means of serving an important public purpose, because less drastic alternatives were available," and on the basis that the Fiscal Plan's revenue assumptions are unreasonably conservative, and, overall, the *289 Fiscal Plan's budgeting fails to effectuate the Oversight Board's mandate "to restore fiscal responsibility and thereby facilitate access to the capital markets." (See Am. Compl. ¶¶ 178-83.) Plaintiff, however, has not proffered facts indicating the existence of a materially different viable approach that the Commonwealth could have adopted in "a more moderate course of action" to serve the entirety of the "stated purpose" of the Moratorium Legislation, Moratorium Orders and Fiscal Plan Compliance Act. See 633 F.3d at 47. Plaintiff's allegations do not support a reasonable inference that any viable alternatives existed that could have provided for necessary government services to address the health, safety, welfare and economic crises, restored access to capital markets and avoided the impairment of which Plaintiff complains.
Plaintiff has thus failed to meet its burden of pleading facts sufficient to allow the Court to draw a reasonable inference that the Moratorium Legislation, Moratorium Orders, and Fiscal Plan Compliance Act were "unreasonable or unnecessary to effectuate an important government purpose" and, as explained above, Plaintiff has failed to allege plausibly that the Fiscal Plan is an exercise of Commonwealth legislative power. Accordingly, the First Claim for Relief is dismissed for failure to state a claim upon which relief can be granted in so far as it challenges the constitutionality of the Fiscal Plan, the Moratorium Legislation, the Moratorium Orders, and the Fiscal Plan Compliance Act.
2. Fourth Claim for Relief: Sections 303(1) and Section 303(3) of PROMESA
Plaintiff's Fourth Claim for Relief asserts that the Challenged Actions are unlawful and void, as violating either Section 303(1) or Section 303(3) of PROMESA. (Am. Compl. ¶ 234.) As explained above, the Court lacks subject matter jurisdiction of the Fourth Claim for Relief to the extent it seeks to invalidate certification of the Fiscal Plan or prohibit actions predicated on such certification. The Court has considered the parties' arguments concerning preemption by Section 303 of PROMESA and concludes, for the following reasons, that the remainder of the Fourth Claim for Relief fails to state a claim upon which relief can be granted.
a. Section 303(1)
Plaintiff asserts that the Fiscal Plan, Fiscal Plan Compliance Act, Moratorium Legislation and Moratorium Orders are expressly preempted by Section 303(1) of PROMESA, and seeks declaratory and injunctive relief invalidating the certification of the Fiscal Plan and blocking implementation of the other Challenged Actions.[11] (Am. Compl. ¶¶ 129-141, 187-193.) Specifically, Plaintiff argues that (i) the Fiscal Plan, Fiscal Plan Compliance Act, Moratorium Legislation and Moratorium Orders each impermissibly establish a method of "composition of indebtedness" and (ii) the Moratorium Legislation and Moratorium Orders constitute impermissible "moratorium" laws that "prohibit payment of principal and interest on the [PRHTA Bonds]." (Id. ¶¶ 135-138.) Accordingly, Plaintiff seeks, among other relief, entry of an order declaring that the Fiscal Plan, Fiscal Plan Compliance Act, Moratorium Legislation and Moratorium Orders are preempted by Section 303 of PROMESA. (Id. ¶ 236.) Defendants argue that Plaintiff has failed to state a claim because the Moratorium Legislation and Moratorium Orders *290 do not dictate the ultimate treatment of Plaintiff's claims and, as such, do not "bind" Plaintiff within the meaning of Section 303(1), which provides that "a territory law prescribing a method of composition of indebtedness or a moratorium law, but solely to the extent that it prohibits the payment of principal or interest by an entity not described in Section 109(b)(2) of title 11, United States Code, may not bind any creditor of a covered territory or any covered territorial instrumentality thereof that does not consent to the composition or moratorium." (Mot. at 42-43; PROMESA § 303(1).)
"Express preemption occurs when congressional intent to preempt state law is made explicit in the language of a federal statute." Tobin v. Fed. Exp. Corp., 775 F.3d 448, 452 (1st Cir. 2014). The existence of an express preemption clause, however, "does not immediately end the inquiry." See Altria Grp., Inc. v. Good, 555 U.S. 70, 76, 129 S.Ct. 538, 172 L.Ed.2d 398 (2008). The Court must first ascertain "the substance and scope of Congress' displacement of state law." ( Id. ) "Congressional intent is the principal resource to be used in defining the scope and extent of an express preemption clause," and courts look to the clause's "text and context" as well as the "purpose and history" of the statute. Brown v. United Airlines, Inc., 720 F.3d 60, 63 (1st Cir. 2013).
Section 303(a) of PROMESA is an express preemption provision that renders certain territorial laws non-binding on nonconsenting territorial creditors. Section 303(1) is substantially similar to Section 903 of the Bankruptcy Code. See 11 U.S.C.S. § 903(1) (LexisNexis 2010 & Supp. 2017) (providing that "a State law prescribing a method of composition of indebtedness of such municipality may not bind any creditor that does not consent to such composition"). Section 903 of the Bankruptcy Code was enacted to prevent states from establishing their own municipal bankruptcy laws. See Puerto Rico v. Franklin California Tax-Free Tr., --- U.S. ----, 136 S.Ct. 1938, 1944-45, 195 L.Ed.2d 298 (2016) (explaining that "Congress enacted [ Section 903 ] expressly pre-empting state municipal bankruptcy laws.") Section 303(1) adds a provision precluding certain aspects of moratorium laws from binding non-consenting creditors.
Based on a plain reading of the statutory text, Section 303(1) applies to two types of laws: (i) territory laws prescribing a method of composition of indebtedness, and (ii) moratorium laws prohibiting the payment of principal or interest. PROMESA § 303(1). Pursuant to Section 303(1), neither type of law may bind nonconsenting creditors. Id. The Court now turns to the question of whether, in light of the "text and context" of Section 303(1), the Fiscal Plan Compliance Act, Moratorium Orders, and Moratorium Legislation are preempted by that provision.
i. "Territory Law Prescribing a Method of Composition of Indebtedness"
A "composition" is an "agreement between a debtor and two or more creditors for the adjustment or discharge of an obligation for some lesser amount." Franklin California Tax-Free Trust v. Puerto Rico, 85 F.Supp.3d 577, 597 (D.P.R. 2015) (citing BLACK'S LAW DICTIONARY 346 (10th ed. 2014) ). The Fiscal Plan Compliance Act, Moratorium Orders, and Moratorium Legislation[12] do not provide for any adjustment *291 or discharge of the obligations of any creditor "for some lesser amount" and Plaintiff does not allege that any challenged measure includes such a provision. Plaintiff thus fails to plead plausibly that Section 303(1) applies to preempt the Fiscal Plan Compliance Act, Moratorium Orders and Moratorium Legislation.
ii. Moratorium Law
A "moratorium" is a "[a]n authorized postponement, usu[ally] a lengthy one, in the deadline for paying a debt or performing an obligation." BLACK'S LAW DICTIONARY 1101 (9th ed. 2009). The Amended Moratorium Act provides that, during the emergency period, the Governor shall pay debt service to the extent (a) possible after all essential services of the Commonwealth of Puerto Rico have been provided for, or (b) he is ordered to do so by the Oversight Board or any other board created under federal law. Amended Moratorium Act § 203(a). The Moratorium Orders, among other things, declared a state of emergency over the Commonwealth and certain governmental entities, including PRHTA, and suspended the payment of certain debt obligations. As such, the combined effect of the Amended Moratorium Act and the Moratorium Orders is to authorize a postponement of the deadline for payment of principal and interest on a debt. Thus, the question of whether the Moratorium Legislation and Moratorium Orders are subject to Section 303(1) of PROMESA turns on whether they prohibit the payment of principal or interest. The language of the Moratorium Legislation and Moratorium Orders does not prohibit the ultimate payment of principal and interest on the Commonwealth's debt obligations, nor do they prohibit the accrual of interest during the emergency period. As stated in Part F of the Legislative Assembly's preface to the Moratorium Law:
the Act does not provide for a composition or discharge of debts; instead, all claims and priorities are preserved, and any unpaid amounts on the obligations of the Commonwealth and its instrumentalities are not forgiven and instead are payable, as set forth in the Act at the end of any moratorium period to the extent permitted by any applicable law.... Accordingly, the Act seeks only to empower the Commonwealth to delay payment on certain obligations while protecting creditor rights ...."
English version of Act No. 21-2016, at 54.
Section 303(1) of PROMESA does not, by its plain terms, preclude the effectiveness of moratoria that constitute only temporary suspensions or extensions of the debtor's payment obligations. It only declares that prohibitions of interest or principal payments do not have binding effects on creditors. To read the statute as precluding even temporary suspensions or extensions that do not reduce the ultimate legal liability of the debtor would fundamentally cripple a territorial debtor's ability to benefit from the breathing space afforded by Title III of PROMESA as the debtor proceeds toward adjustment of its debt obligations under federal law.
When considered in the context of PROMESA and in light of Section 903 of Bankruptcy Code, it is evident that Section 303(1) of PROMESA was enacted to bar territories from establishing their own bankruptcy-like debt restructuring processes. See COLLIER ON BANKRUPTCY ¶ 903.01 (16th ed. 2017) (stating that " Section 903 is little more than Congress's attempt to proclaim the propriety of establishing a national, uniform procedure for adjusting municipal debts.") The Moratorium Legislation and Moratorium Orders only authorize temporary extensions of Plaintiff's obligations. They do not empower the Commonwealth to discharge, cancel or force surrender of any bonds. The Moratorium Legislation and Moratorium Orders *292 neither prohibit the payment of principal and interest nor purport to bind creditors to any reduction of the outstanding obligations; they are therefore outside the scope of Section 303(1), and the Fourth Claim for Relief fails to state a claim upon which relief may be granted to the extent it is premised on PROMESA Section 303(1).
b. Section 303(3)
Plaintiff also asserts that the Fiscal Plan and Moratorium Orders are preempted by Section 303(3) as unlawful executive orders. (Am. Compl. ¶¶ 129-30, 140, 187-93.) Defendants seek the dismissal of this element of the Fourth Claim for Relief as well, asserting that Plaintiff fails to state a claim (i) as to the Fiscal Plan because Section 303(3) does not apply to acts of the Oversight Board and (ii) as to the Moratorium Orders because Plaintiff has failed to plead plausibly that such orders are "unlawful" or that they have caused a distinct injury. (Opp'n at 43-44.) Section 303(3) of PROMESA provides that:
unlawful executive orders that alter, amend, or modify rights of holders of any debt of the territory or territorial instrumentality, or that divert funds from one territorial instrumentality to another or to the territory, shall be preempted by [PROMESA].
48 U.S.C.S. § 2163(3) (LexisNexis 2017).
The statute plainly applies only to "executive orders" that are also "unlawful." Plaintiff argues that the Fiscal Plan (i) constitutes an executive order "because it was developed and submitted by AAFAF at the direction and with the oversight of the Governor" and (ii) is "unlawful" because it violates the Contracts, Takings, and Due Process Clauses of the U.S. Constitution. (Am. Compl. ¶ 189; Opp'n at 52.) As explained above, Plaintiff has failed to state a claim with respect to its First Claim for Relief (Contracts Clause claim), and the Court lacks subject matter jurisdiction of the Second Claim for Relief (Takings and Due Process claims). Because Plaintiff has not stated viable claims of unlawful behavior, it is unnecessary for the Court to reach the question of whether the Fiscal Plan constitutes an executive order.
There is, however, no dispute that the Moratorium Orders constitute "executive orders" that are potentially subject to Section 303(3) of PROMESA. Plaintiff argues that the Moratorium Orders are unlawful, within the meaning of Section 303(3) of PROMESA, because they are derived from the Moratorium Legislation that Plaintiff alleges is unconstitutional. (Opp'n at 52-53.) For the reasons explained above, Plaintiff has failed to state a claim with respect to the First Claim for Relief of the Amended Complaint, and the Court lacks subject matter jurisdiction of the Second Claim for Relief. Because Plaintiff has failed to state plausible, ripe claims that the Moratorium Orders and Moratorium Legislation are unconstitutional, it fails to state a claim upon which relief may be granted in connection with PROMESA Section 303(3).
As noted above, the Court has already determined that it lacks subject matter jurisdiction of the Fourth Claim for Relief to the extent it is seeks to invalidate certification of the Fiscal Plan or prohibit actions predicated on such certification. The remainder of Plaintiff's Fourth Claim for Relief is dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6).
3. Fifth Claim for Relief: Section 407 of PROMESA
Plaintiff's Fifth Claim for Relief seeks an order (i) declaring that "any transferee of property" that was transferred pursuant to a Challenged Action is "liable for value of such transfer[ ]" pursuant to Section 407 *293 of PROMESA, and (ii) compelling the return of all funds for which the Defendants are found liable pursuant to Section 407 of PROMESA. (Am. Compl. ¶ 244.) Defendants move to dismiss this claim in its entirety, arguing that relief under Section 407 of PROMESA is unavailable because the Title III automatic stay is in effect. (Mot. at 45). Alternatively, to the extent that the claim is not barred by the automatic stay, Defendants argue that Plaintiff has failed to state a claim because it has failed to allege a violation of a law that either (i) gives rise to a valid security interest, or (ii) assures a transfer of assets to PRHTA for the benefit of the PRHTA Bondholders.
Section 407(a) of PROMESA provides that:
While an Oversight Board for Puerto Rico is in existence, if any property of any territorial instrumentality of Puerto Rico is transferred in violation of applicable law under which any creditor has a valid pledge of, security interest in, or lien on such property, or which deprives any such territorial instrumentality of property in violation of applicable law assuring the transfer of such property to such territorial instrumentality for the benefit of its creditors, then the transferee shall be liable for the value of such property.
48 U.S.C.S. § 2195(a) (LexisNexis 2017). Section 407(b), in turn, provides creditors with a mechanism to enforce rights under Section 407. Specifically, it provides as follows:
A creditor may enforce rights under this section by bringing an action in the United States District Court for the District of Puerto Rico after the expiration or lifting of the stay of section 405, unless a stay under title III is in effect.
48 U.S.C.S. § 2195(b) (LexisNexis 2017). On its face, Section 407(b) of PROMESA expressly bars creditor enforcement actions when, as here, a stay is in effect under Title III.
It is undisputed that a stay is currently in effect pursuant to Section 362 of the Bankruptcy Code, as made applicable to these Title III proceedings pursuant to Section 301 of PROMESA. In an attempt to circumvent this express limitation on the availability of the Section 407 cause of action, Plaintiff asserts that the PRHTA Pledged Special Revenues are exempt from the automatic stay and thus are exempt from Section 407(b)'s enforcement restrictions. (Opp'n at 54.) As explained in Assured, Section 922(d) of the Bankruptcy Code is a permissive statutory provision that merely excepts the "application" of special revenues from the automatic stay and does not grant relief from the stay for enforcement of claims of right to such revenues. Assured at 16-24. Section 922(d) does not provide relief from the Title III automatic stay that would affect the availability of the Section 407 cause of action, which is by its terms simply unavailable when "a stay under title III is in effect."
Plaintiff's alternative argument that Section 407(b) does not bar a "request for declaratory relief" equally lacks merit. Section 407(b) creates a specific liability and a specific, limited cause of action to enforce such a liability. The liability is "for the value" of the improperly transferred property and, as explained above, the cause of action is not available when a stay is in effect under Title III. Recognition of a cause of action for declaratory relief based on Section 407 when the Section 407 cause of action is precluded would be facially inconsistent with the statute. Accordingly, the Fifth Claim for Relief is hereby dismissed in its entirety, without prejudice, because the automatic stay is currently in effect and renders unavailable any cause of action pursuant to Section 407 of PROMESA.
*294 4. Sixth Claim for Relief: Sections 922 and 928 of the Bankruptcy Code
In the Sixth Claim for Relief, Plaintiff requests: (i) a declaratory judgment stating that application of the PRHTA Pledged Special Revenues does not violate the automatic stay and that Defendants' failure to remit post-petition payments to the PRHTA Bondholders violates Sections 922(d) and 928(a) of the Bankruptcy Code ; and (ii) an injunction ordering Defendants to remit the PRHTA Pledged Special Revenues to the PRHTA Bondholders and to not take any action that could impair the transfer of such revenues to the PRHTA Bondholders. (Am. Compl. ¶¶ 250-52.) Defendants move to dismiss Plaintiff's claims for injunctive and declaratory relief regarding Defendants' alleged obligation pursuant to Sections 922(d) and 928(a) to remit payments to PRHTA Bondholders during the pendency of these Title III proceedings, arguing that those Bankruptcy Code sections, which are incorporated into Title III by Section 301 of PROMESA, do not require PRHTA to make payments during the pendency of the Title III proceeding. (Opp'n at 47-50). Because the viability of Plaintiff's claims turns on whether the cited Bankruptcy Code sections mandate current payments, the Court leaves aside for the moment the question of whether Plaintiff has a valid security interest in pledged special revenue and examines in the first instance the parties' contentions concerning Sections 928 and 922(d) of the Bankruptcy Code.
Plaintiff argues that Section 928(a) of the Bankruptcy Code not only overrides the general rule of Bankruptcy Code Section 552(a) (which provides that property acquired by a debtor after the commencement of a bankruptcy proceeding is not subject to liens resulting from pre-petition security agreements), by providing for attachment of liens post-petition to the extent they secure certain special revenue bonds, but also requires, either alone or in concert with Section 922(d), continuity of payments on such bonds during the Title III proceeding. (Am. Compl. ¶ 199-204.) Section 928 reads in its entirety as follows:
(a) Notwithstanding section 552(a) of [the Bankruptcy Code] and subject to subsection (b) of this section, special revenues acquired by the debtor after the commencement of the case shall remain subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case.
(b) Any such lien on special revenues, other than municipal betterment assessments, derived from a project or system shall be subject to the necessary operating expenses of such project or system, as the case may be.
11 U.S.C.S. § 928 (LexisNexis 2010). As explained in Assured, Section 928 of the Bankruptcy Code does not mandate the turnover of special revenues. See Assured at 19. Rather, "[t]he statute clearly and simply provides that certain pre-petition liens will remain in place after the filing of the petition, notwithstanding Section 552(a)'s general protection of after-acquired property from pre-petition liens." See Assured at 18.
Plaintiff's assertions that Section 922(d) of the Bankruptcy Code requires Defendants to turn over the revenues allegedly securing the PRHTA Bonds, and that Section 922(d) exempts bondholder enforcement actions from the automatic stays otherwise in effect pursuant to Sections 362(a) and 922(a) of the Bankruptcy Code, are also unavailing. Section 922(d) does not require "debtors, or third parties holding special revenues, to apply the revenues to outstanding obligations." See Assured at 20. Moreover, Section 922(d) only excepts the "application" of special revenues from *295 the automatic stay, and does not address other types of enforcement actions that are stayed by Sections 362(a) and 922(a). See Assured at 23. Therefore, Section 922(d) does not except actions to enforce special revenue liens.
Because neither Section 922(d) nor Section 928 requires or empowers the Court to order the payment of the pledged special revenues to the PRHTA Bondholders, the Sixth Claim for Relief fails to state a claim upon which relief may be granted and is therefore dismissed in its entirety.[13]
5. Seventh Claim for Relief: Reserve Revenues
In Seventh Claim for Relief, Plaintiff seeks orders declaring that (i) all funds held in the Reserve Accounts are property of the PRHTA Bondholders and (ii) PRHTA lacks an interest sufficient to prevent funds held in the Reserve Accounts from flowing to the PRHTA Bondholders, unless and until all outstanding PRHTA Bonds have been fully retired or defeased. (Am. Compl. ¶¶ 259-60.) The structure of the allegations in the Seventh Claim for Relief, particularly in paragraph 255 of the Amended Complaint, suggests that Plaintiff is proceeding on three theories of entitlement to the reserve funds-first, that the PRHTA Bondholders own outright the funds in the Reserve Account (See Am. Comp. ¶ 118 ("all funds in the Reserve Accounts are property of the [PR]HTA Bondholders"), second, that the PRHTA Bondholders are beneficiaries of a trust that holds the funds in the Reserve Account (see id. ("all funds in the Reserve Accounts are ... held in trust for their benefit") and, third, that the PRHTA Bondholders hold a lien on the funds in the Reserve Account (id. ("all funds in the Reserve Accounts are ... subject to a lien in their favor").) As explained above, the Court lacks subject matter jurisdiction of the Seventh Claim for Relief to the extent it is premised solely on the existence of a lien. The Court will now address the viability of Plaintiff's ownership- and trust-based theories.
a. Bondholders as Reserve Account Owners
Plaintiff alleges that it (or its subrogors) own the Reserve Account funds, and, on the basis of such alleged ownership, assert that neither the automatic stay nor Section 305 of PROMESA presents a barrier to collection of the funds because they are not the property of any Title III debtor. Indeed, Plaintiff asserts that the "funds held in the Reserve Accounts are the exclusive property of the [PR]HTA Bondholders" and not of the Commonwealth. (Am. Compl. ¶¶ 15, 209.)
Section 401 of the 1968 Resolution provides, in relevant part, that:
The moneys in [the Reserve] Account[ ] shall be held by the Fiscal Agent in trust and applied as hereinafter provided with regard to ... such ... Account and, pending such application, shall be subject to a lien and charge in favor of the holders of the bonds issued and outstanding under this Resolution and for the further security of such holders until paid out or transferred as herein provided.
(Docket Entry No. 51-4 at 41.) Section 401 of the 1998 Resolution includes language that is substantially similar. (See Docket *296 Entry No. 51-5 at 47.) As explained in Assured, the provisions of the Resolutions are devoid of language that could plausibly support an inference that PRHTA has conferred a full and exclusive ownership interest in Reserve Account funds on the PRHTA Bondholders. See Assured at 25-26. The Court finds that Plaintiff has failed to plead plausibly that the PRHTA Bondholders hold an outright ownership interest in the Reserve Accounts.
b. Bondholders as Beneficiaries of a Trust
The Court now turns to Plaintiff's assertion that the funds held in the Reserve Accounts are "held in trust" by the fiscal agent, BNYM, for the benefit of the PRHTA Bondholders. (See, e.g., Am. Compl. ¶¶ 207, 255.) Plaintiff relies on Sections 401 and 501 of the 1968 Resolution, as well as Sections 401 and 410 of the 1998 Resolution.[14] Section 501 of the 1968 Resolution is titled "Deposits Constitute Trust Funds ; Security for Deposits" and provides, in relevant part, that "[a]ll moneys deposited with the Fiscal Agent under the provisions of [the] Resolution shall be held in trust ... and shall not be subject to lien or attachment by any creditor of [PRHTA]." Id. § 501 (emphasis added) (Docket Entry No. 51-4). The Section goes on to state that "[a]ll moneys deposited with the Fiscal Agent [ ] shall be continuously secured, for the benefit of the Authority and the holders of the bonds ...." Id. Section 410 of the 1998 Resolution provides that "moneys held for the credit" of the relevant Reserve Account "shall be held in trust and disbursed by the Fiscal Agent." 1998 Resolution § 410 (Docket Entry No. 51-5). Sections 207 and 711 of the 1998 Resolution also make reference to "trusts [ ] created" by the resolution. 1998 Resolution §§ 207, 711.
Defendants argue that the use of the word "trust" in the resolutions is not, alone, sufficient to create a trust under the law of Puerto Rico, and that the full nature of the contemplated transaction should be considered. Defendants assert that the funds in the Reserve Accounts are only "held in trust first for the 'further security' of the [PRHTA] [B]ondholders and then to be disbursed to PRHTA once the bondholders are fully paid" and that, consequently, the funds are "not held in trust for the sole purpose of paying the bondholders." (Mot. at 52-53 (citing 1968 Resolution § 401; 1998 Resolution § 401).)
As explained in Assured, while "multiple interpretations could plausibly be supported by the documentation and the allegations of the [ ] Complaint, each contemplates that PRHTA has title or at minimum some contingent reversionary beneficial interest in the trust corpus." (See Assured at 28.) As such, "PROMESA Section 305's prohibitions on interference with Debtor property interests, revenues and use and enjoyment of income-producing property deprive this Court of power to interfere with the Debtors' dealings with the Reserve Fund property." (See Assured at 28.) The Seventh Claim for Relief therefore fails to state a claim upon which relief may be granted to the extent it is premised on the contention that the Reserve Fund assets are held in trust for bondholders.
CONCLUSION
For the foregoing reasons, Defendants' motion to dismiss the First, Second, Fourth, Fifth, Sixth, and Seventh Claims for Relief asserted in the Amended Complaint is granted. Plaintiff's Second Claim for Relief is dismissed pursuant to *297 Federal Rule of Civil Procedure 12(b)(1). The First and Fourth Claims for Relief are dismissed pursuant to Rule 12(b)(1) to the extent they seek to invalidate the Fiscal Plan on the basis of noncompliance with certification-related provisions of PROMESA or challenge the Oversight Board's certification decision, and are dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6) in all other respects. Plaintiff's Fifth and Sixth Claims for Relief are dismissed pursuant to Rule 12(b)(6). The Seventh Claim for Relief is dismissed pursuant to Rule 12(b)(6) to the extent that Claim for Relief is premised on a claim of outright PRHTA Bondholder ownership or trust beneficiary status as to the funds in the Reserve Accounts and is dismissed pursuant to Rule 12(b)(1) to the extent it is premised on a lien on the Reserve Accounts. The Third Claim for Relief has been withdrawn. In light of the foregoing disposition of Plaintiff's claims, the evidentiary objections that were asserted by the parties are moot and need not be addressed. This Opinion and Order resolves docket entry nos. 48, 50, and 51 in 17 AP 159.
The Clerk of Court is directed to enter judgment accordingly and close this adversary proceeding.
SO ORDERED.

All docket entry references are to entries in case no. 17 AP 159, unless otherwise specified.

Additionally, the Court has received requests that it take judicial notice of (i) five exhibits submitted by Defendants (Docket Entry No. 51, "Defendants' Request"), (ii) two exhibits submitted by Non-Debtor Defendants (Docket Entry No. 50, "Non-Debtor Defendants' Request"), and (iii) Exhibits D-M submitted by Plaintiff and attached to the Declaration of Ellen M. Halstead ("Halstead Declaration"), dated September 12, 2017 (Docket Entry No. 68-1, "Plaintiff's Request"). Evidentiary objections have been raised by (i) Defendants to Plaintiff's Request (Docket Entry No. 98) and (ii) Plaintiff to Exhibits A and B of Defendants' Request. The Court hereby takes judicial notice of the 1968 Resolution (Exhibit D to Defendants' Request and Exhibit B to the Halstead Declaration) and the 1998 Resolution (Exhibit E to Defendants' Request and Exhibit C to the Halstead Declaration). The Court need not address the objections and declines to take judicial notice of the remaining documents, as they are immaterial to the decisions set forth in this Opinion.

Capitalized terms used in this paragraph are defined infra.

References to the "Governor" prior to January 2, 2017, refer to the former Governor of the Commonwealth, Alejandro García Padilla. References to the "Governor" on or after January 2, 2017, refer to Governor Ricardo Rosselló Nevares.

On January 29, 2017, the Puerto Rico legislature enacted the Puerto Rico Financial Emergency and Fiscal Responsibility Act (Act No. 5-2017, the "Amended Moratorium Act," and together with the Moratorium Act, the "Moratorium Legislation"). (Am. Compl. ¶ 6.) The Amended Moratorium Act repealed Chapters 1 and 2 of the Moratorium Act and enacted certain new provisions. See Amended Moratorium Act §§ 201-203, 206, 208, 211, 301.

PROMESA is codified at 48 U.S.C. Section 2101 et seq. All references to PROMESA provisions in the remainder of this opinion are to the uncodified version of the legislation.

See Docket Entry 35-7.

Plaintiff asserts that, even if PRHTA had not defaulted, the depletion of Reserve Account funds caused by the Moratorium Orders and Moratorium Legislation would alone constitute a redressable injury. (Id. )

As explained above, Section 106(e) of PROMESA deprives the Court of subject matter jurisdiction of Plaintiff's claims insofar as they attack the certification of the Fiscal Plan or Oversight Board determinations that are inherent in the certification of a Fiscal Plan.

Defendants argue that the Moratorium Orders do not qualify as a "territory law," and therefore are not covered by Section 303(1) of PROMESA. (Mot. at 42, n. 18.) As explained above, Plaintiff has pled plausibly that the Moratorium Orders may properly be treated as Commonwealth laws. Plaintiff has not done so, however, with respect to the Fiscal Plan.

Plaintiff's request, in Sixth Claim for Relief, for an order that "the filing of [a] Title III petition[ ] by [PRHTA] does not operate as a stay of the application of [PR]HTA Pledged Special Revenues to the repayment of the [PR]HTA [r]evenue [b]onds" (Am. Compl. ¶ 250) does not, in and of itself, frame a justiciable case or controversy. There appears to be no dispute that the statute says what it says, to wit, that application of pledged special revenues is not stayed. Thus, paragraph 250 seeks a redundant advisory opinion.

The relevant language of Section 401 of the 1968 Resolution is substantially similar to that of Section 401 of the 1998 Resolution.